**Stanton R. Gallegos, OSB #160091**
StantonGallegos@MarkowitzHerbold.com
**Jermaine F. Brown, OSB # 073415**
JermaineBrown@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

**Neal J. Deckant** *
ndeckant@bursor.com
**Julia K. Venditti** *
jvenditti@bursor.com
BURSOR & FISHER, P.A.
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455

*Attorneys for Plaintiff and the Putative Class*
*Additional Counsel on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JULIE EASTERBROOK, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No. 6:22-cv-01108-MC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) VIOLATION OF OREGON'S UNLAWFUL TRADE PRACTICES ACT ("UTPA"), ORS 646.608(1)(ttt);**<br><br>**(2) VIOLATION OF OREGON'S UTPA, ORS 646.608(1)(sss); AND**<br><br>**(3) UNJUST ENRICHMENT / RESTITUTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Julie Easterbrook ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant LinkedIn Corporation ("LinkedIn" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its paid subscription plans for LinkedIn-branded products and services that are available exclusively to consumers who enroll in Defendant's auto-renewal programs (collectively, "LinkedIn Premium" or the "LP Subscriptions," enumerated below) through its website at https://www.linkedin.com (the "LinkedIn Website") and its mobile applications (the "LinkedIn Apps") (together with LinkedIn Website, the "LinkedIn Platform").  Defendant is an international corporation that owns and operates the LinkedIn Platform, which is an online career-focused social media network of business professionals.[1]  Relevant to Plaintiff's allegations, when consumers sign up for the LP Subscriptions through the LinkedIn Platform, Defendant actually enrolls consumers in a program that automatically renews customers' LP Subscriptions from month-to-month or year-to-year and results in monthly or annual charges to the consumer's credit card, debit card, or third-party payment account (collectively, the "Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to and obtained from Oregon consumers under Oregon's Automatic Renewal Law ("ARL"), ORS 646A.295, in direct

---

[1] The Platform is mainly used for professional networking and allows members (typically job seekers and employers) to "connect" to each other, *e.g.*, by posting CVs and job openings.

violation of Oregon's Unlawful Trade Practices Act ("UTPA"), ORS 646.608(1)(ttt), and under Oregon's Free Offer Law ("FOL"), ORS 646.644, in violation of Oregon's Unlawful Trade Practices Act ("UTPA"), ORS 646.608(1)(sss).

2.      With over 850 million members in 200 countries and regions worldwide (and more than 191 million members in the United States), the LinkedIn Platform is the "world's largest professional network."[2]  While the basic features of the LinkedIn Platform are free to use, Defendant offers various products and features that are only available to paid LinkedIn Premium subscribers.[3]  Specifically, Defendant offers LinkedIn Premium in various different tiers, which include the following fee-based automatic renewal membership programs: Premium Career, Premium Business, Sales Navigator Professional, Recruiter Lite, and LinkedIn Learning (collectively, the "LP Subscriptions" or "LinkedIn Premium").[4]

3.      Through the LinkedIn Platform, Defendant markets, advertises, and sells to consumers in Oregon and throughout the United States paid memberships to the LP Subscriptions.  To sign up for one of Defendant's paid LP Subscriptions through the LinkedIn Platform, customers must provide Defendant with their billing information and Defendant then

---

[2] LinkedIn Pressroom, "About Us," *available at* https://news.linkedin.com/about-us#Statistics (last accessed Oct. 21, 2022).  Indeed, LinkedIn has been described as "the world's preeminent social network for professionals."  Business of Apps, *LinkedIn Usage and Revenue Statistics* (Sep. 6, 2022), *available at* https://www.businessofapps.com/data/linkedin-statistics/.

[3] *See* Kinsta Blog, *Mind-Blowing LinkedIn Statistics and Facts (2022)* (Jun. 15, 2022), https://kinsta.com/blog/linkedin-statistics/ (last accessed Jul. 20, 2022) ("A total of 39% of LinkedIn users pay for LinkedIn Premium, which has four price tiers[.]").

[4] Premium Career "gives you access to five InMail messages per month and in-demand videos, as well as the ability to see who viewed your profile, how many searches you've appeared in, and additional information on posted jobs (including salary)."  Kinsta Blog, *Mind-Blowing LinkedIn Statistics and Facts* (Jun. 15, 2022), *supra* note.  "The other tiers include essentially the same basic features but then go a step or two further."  Premium Business gives you additional information about businesses and unlimited people searches; Sales Navigator Pro gives you advanced search filters, access to different sales tools, and the ability to make notes on user profiles; and Recruiter Lite gives you guided search smart suggestions and more recruiter-focused tools."  *Id.*  Note that LinkedIn Learning is included in all Premium subscriptions and, for the majority of the Class Period, was also offered as its own distinct subscription plan.

automatically charges customers' Payment Method as payments are due, typically on a monthly or annual basis. Defendant is able to unilaterally charge its customers renewal fees without their consent, as it is in possession of its customers' billing information. Thus, Defendant has made the deliberate decision to bilk Plaintiff and other similarly situated customers on a monthly or yearly basis, absent their consent under the ARL, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

4.      Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to Oregon consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase, *see* ORS 646A.295(1)(a); *see also* ORS 646A.293(5)(a)-(e) (setting forth definition of "offer terms" as used in ORS 646A.295); (ii) obtain consumers' affirmative consent to the purchase prior to charging their Payment Methods in connection with the subscriptions, *see* ORS 646A.295(1)(b); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see* ORS 646A.295(1)(c), ORS 646A.295(2).

5.      Consumers purchasing the LP Subscriptions do so either by choosing a free trial that automatically converts into a paid subscription at the end of the trial period, or a "straight-to-paid" monthly or annual subscription that automatically renews in regular intervals at either the full standard recurring rate that Defendant ordinarily charges for the particular subscription plan, or at a promotional or discounted rate that remains static for a limited period of time and then automatically renews to the full standard rate. As will be discussed below, the enrollment process for the LP Subscriptions through the LinkedIn Platform uniformly violates each of the core requirements of the ARL.

Page 4 – FIRST AMENDED COMPLAINT

6.      Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in direct violation of Section 646A.295(1)(a) of the ARL; (ii) charging consumers' Payment Method without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in direct violation of Section 646A.295(1)(b) of the ARL; and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 646A.295(1)(c) of the ARL.  The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their LP Subscriptions, in violation of Section 646A.295(2) of the ARL.

7.      As a result, all goods, wares, merchandise, or products sent to Plaintiff and the Class under the automatic renewal or continuous service agreements are deemed to be "unconditional gifts" under the ARL.  ORS 646A.295(5).

8.      For the foregoing reasons, Plaintiff brings this action individually and on behalf of all Oregon purchasers of any of Defendant's LP Subscription offerings who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their LP Subscriptions.  Based on Defendant's unlawful conduct, Plaintiff seeks damages (including compensatory, statutory, and/or punitive damages), restitution, declaratory relief, injunctive relief, reasonable attorneys' fees and costs, and any other relief as the Court may deem proper, for:  (i) violations of Oregon's Unlawful

Trade Practices Act (the "UTPA"), ORS 646.608(1)(ttt), based on Defendant's failure to comply with the ARL; (ii) violations of Oregon's UTPA, ORS 646.608(1)(sss), based on Defendant's failure to comply with the FOL; and (iii) unjust enrichment / restitution.

## THE PARTIES

9.      Plaintiff Julie Easterbrook is a citizen of Oregon, residing in Myrtle Creek, Oregon.  In or about January 2019, Ms. Easterbrook signed up for a free trial of Defendant's monthly LinkedIn Premium Career subscription from Defendant's website while in Oregon. During the enrollment process but before finally consenting to Defendant's subscription offering, thereby completing the checkout process, Ms. Easterbrook provided her Payment Method information directly to Defendant.  At the time Ms. Easterbrook enrolled in her LP Subscription program, Defendant did not disclose to Ms. Easterbrook all required automatic renewal offer terms associated with the subscription program or obtain Ms. Easterbrook's affirmative consent to those terms.  For instance, at the time of enrollment, Ms. Easterbrook was not aware that, upon the expiration of Ms. Easterbrook's free trial subscription, Defendant would automatically convert her free trial into a paid, automatically renewing subscription.  Further, after Ms. Easterbrook completed her initial order, Defendant sent Ms. Easterbrook an email receipt for her purchase of an LP Subscription (the "Acknowledgment Email").  However, the Acknowledgment Email, too, failed to provide Ms. Easterbrook with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Easterbrook's LP Subscription in a manner capable of being retained by her.  Ms. Easterbrook did not receive any other acknowledgement that contained the required information.  As a result, Ms. Easterbrook was not placed on notice of several material terms associated with her LP Subscription.  In particular, Ms. Easterbrook

was not made aware of the fact that her LP Subscription would automatically convert to a paid

subscription after the initial free trial period in the first place, or that it would continue to renew

on a recurring basis thereafter and result in continuous monthly charges to her Payment Method

unless and until she took action to successfully cancel her LP Subscription.  Nor was she

adequately informed of the recurring price to be charged upon renewal, the length of the renewal

term or when the first charge would occur, or the complete cancellation policy associated with

her LP Subscription, the most crucial aspects of which were missing from the Checkout Page and

Acknowledgment Email.  Nevertheless, on or around February 25, 2019, approximately one

month after Ms. Easterbrook first signed up for her free trial LP Subscription in January 2019,

Defendant automatically renewed Ms. Easterbrook's LP Subscription and charged Ms.

Easterbrook's Payment Method in the amount of $29.99, the full standard monthly rate then-

associated with the LP Subscription.  Thereafter, Defendant continued to automatically renew

Ms. Easterbrook's LP Subscription on a monthly basis, charging her Payment Method an

additional thirty-seven times, with the most recent charge occurring on or around March 29,

2022, for a total of thirty-eight unauthorized charges amounting to $1,139.62 to Ms.

Easterbrook's Payment Method, including eight unauthorized charges amounting to $239.92

within the last twelve months alone.  Ms. Easterbrook did not learn of these subscription charges

until approximately January or February of 2021, when she noticed the recurring monthly

charges LinkedIn had posted to her Payment Method upon review of her monthly billing

statement for unrelated reasons.  Prior to learning of these charges, Ms. Easterbrook did not

attempt to cancel her LP Subscriptions because she had no actual belief or reason to believe that

the LP Subscription would automatically convert to a paid recurring subscription following

expiration the free trial period, and thus she was not aware that cancellation was required in the

first place. Subsequent to her discovery of the unauthorized charges, however, Ms. Easterbrook promptly attempted to cancel her LP Subscription in order to avoid incurring any additional future charges. In fact, Ms. Easterbrook attempted to cancel on at least <u>three</u> different occasions, with the first attempt occurring in or around January or February of 2021, within days (if not on the same day) of first learning of the unauthorized subscription charges. Ms. Easterbrook also attempted to cancel in or around May of 2021, and in or around late March or early April of 2022. Ultimately, however, all but the last of Ms. Easterbrook's cancellation attempts were unsuccessful, and she was unable to terminate her subscription prior to March 2022 due to Defendant's confusing cancellation policy, the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email. Thus, Ms. Easterbrook's first two attempts at cancellation were utterly ineffective. Defendant's missing and/or incomplete disclosures on the Checkout Page and in the Acknowledgment Email for the LP Subscriptions, its failure to obtain Ms. Easterbrook's affirmative consent to the offer terms associated with the LP Subscriptions before charging her Payment Method on a recurring basis, and its subsequent failure to issue any refund of the unauthorized charges she incurred from January 2019 to March 2022, are contrary to the ARL, which deems products provided in violation of the statute to be a gift to consumers. *See* ORS 646A.295; *see also* ORS 646.608(1)(ttt). Further, Defendant's missing and/or incomplete disclosures on the Checkout Page and its failure to obtain Ms. Easterbrook's affirmative consent to the free trial offer terms associated with the LP Subscriptions before charging her Payment Method on a recurring basis are contrary to the FOL, which is an "unlawful practice subject to enforcement and penalty under" the UTPA. *See* ORS 646.644(6); *see also* ORS 646.608(1)(sss). Had Defendant complied with the ARL and FOL, Ms. Easterbrook would have been able to read and review the automatic renewal terms offer on the

Checkout Page prior to purchase and/or in the Acknowledgment Email prior to renewal, and she

would have not subscribed to LinkedIn Premium at all or on the same terms, or she would have

cancelled her LP Subscription earlier, *i.e.*, prior to the expiration of the initial subscription period

and/or any subsequent renewal term.  Thus, as a direct result of Defendant's violations of the

ARL and FOL, Ms. Easterbrook suffered, and continues to suffer, economic injury.[5]

10.     Defendant LinkedIn Corporation ("LinkedIn" or "Defendant") is a Delaware

corporation with its principal place of business at 1000 West Maude Avenue, Sunnyvale, CA

94085.  LinkedIn is an international company that offers various products and services to assist

in career development and professional networking.  Relevant here, Defendant owns and

operates the LP Subscriptions, which it markets to consumers through the LinkedIn Website and

App.  Defendant is also responsible for the promotion, advertisement, and/or marketing of the LP

Subscriptions, and it owns and operates the LinkedIn Website and App, where it markets and

sells the LP Subscriptions.  Defendant sells – and, at all times during the Class Period, sold – the

LP Subscriptions in Oregon and has done business throughout Oregon and the United States.  In

connection with the LP Subscriptions, Defendant made automatic renewal or continuous service

offers to consumers in Oregon and throughout the United States via the LinkedIn Website and/or

App during the Class Period.

11.     Plaintiff reserves the right to amend this Complaint to add different or additional

defendants, including without limitation any officer, director, employee, supplier, or distributor

of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and

deceptive conduct alleged herein.

---

[5] Indeed, on each of the thirty-eight occasions that Ms. Easterbrook incurred fees in connection with her LP
Subscription between January 2019 and March 2022, she suffered an additional, independently actionable injury as a
direct result of Defendant's conduct in the violation of each the ARL and the FOL.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A),

as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class

action where the aggregate claims of all members of the proposed class are in excess of

$5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class,

and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from

Defendant.

13.     This Court has personal jurisdiction over the parties because Plaintiff resides in

Oregon and submits to the jurisdiction of the Court, and because Defendant has, at all times

relevant hereto, systematically and continually conducted business in Oregon, including within

this District, and/or intentionally availed itself of the benefits and privileges of the Oregon

consumer market through the promotion, marketing, and sale of its products and/or services to

residents within this District and throughout Oregon.  Additionally, Plaintiff purchased her LP

Subscription from Defendant while in Oregon.

14.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because a substantial part of the events, omissions, and acts giving rise to the claims herein

occurred in this District.  Also, Plaintiff resides in this District and purchased Defendant's LP

Subscription in this District.  Moreover, Defendant systematically conducts business in this

District and throughout the State of Oregon, and it distributed, advertised, and sold the LP

Subscriptions to Plaintiff and Class Members in this State and District.  The Eugene Division is

the appropriate venue because, as explained below, a substantial part of the events giving rise to

the claims occurred in this division.

## FACTUAL ALLEGATIONS

### A.    Background On The Subscription e-Commerce Market

15.    The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[6] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[7]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[8]  That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[9]

16.    LinkedIn is an international company and employment-oriented online platform that operates via Defendant's website and mobile application.  The company was founded in

---

[6] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[7] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[8] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").  *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

[9] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

December of 2002 and incorporated in Delaware in March 2003.[10]  On March 5, 2003, the

LinkedIn Platform was officially launched, and two years later, in March of 2005, Defendant

adopted the subscription model, placing its premium digital content behind a paywall with the

launch of early versions of LinkedIn Premium.[11]  LinkedIn achieved its first month of

profitability in March 2006,[12] launched a mobile version of the LinkedIn website (*i.e.*, the

LinkedIn App) in February 2008,[13] and "completed [its] initial public offering in May 2011[.]"[14]

LinkedIn's "Class A common stock is listed on the New York Stock Exchange ('NYSE') under

the symbol 'LNKD.'"[15]  In August 2011, LinkedIn revamped its mobile applications.[16]  At the

time, mobile page views of the application were increasing roughly 400% year over year

according to CEO Jeff Weiner.  Subsequently, on December 8, 2016, Microsoft acquired

LinkedIn for $196 a share (a total value of $26.2 billion, or $60 per user).[17]  Soon after

LinkedIn's acquisition by Microsoft, Defendant's new desktop version was introduced in a

---

[10] *See* LinkedIn Corporation, 2015 Annual Report (Form 10-K), *available at* https://www.sec.gov/Archives/edgar/data/1271024/000127102416000035/a20151231-10xkdocument.htm.

[11] *See id.* ("Our Premium Subscription services target small- and medium-sized enterprises and professional organizations, individual members and business groups in larger enterprises. … These subscriptions bundles are sold at different price points. Key features found in the subscription bundles include: … Open Profile[;] … Top Keyword Suggestions[;] … Larger Searching Listing[;] … Premium Search[;] … Saved Search Alerts[;] … Who's Viewed Your Profile[;] … How You Rank[;] … [and] InMail Messages.").

[12] *See* Ann Byers, *Reid Hoffman and Linkedin*, The Rosen Publishing Group (15 July 2013), at 2003.

[13] *See* LinkedIn Official Blog, *Announcing LinkedIn Mobile (includes an iPhone version)* (Feb. 24, 2008), https://blog.linkedin.com/2008/02/24/linkedin-mobile-2; CIO, *New LinkedIn Apps: All Work, No Play* (Oct. 29, 2008), https://www.cio.com/article/2432651/new-linkedin-apps--all-work--no-play.html.

[14] *See* https://www.sec.gov/Archives/edgar/data/1271024/000127102416000035/a20151231-10xkdocument.htm.

[15] *Id.*

[16] Forbes, *LinkedIn Revamps iPhone, Android Apps, Launches HTML5 App* (Aug. 16, 2011), *available at* https://www.forbes.com/sites/tomiogeron/2011/08/16/linkedin-revamps-iphone-android-apps-launches-html5-app/?sh=72fe4c802720.

[17] *See* Wall Street Journal, *Microsoft to Acquire LinkedIn for $26.2 Billion* (June 13, 2016), *available at* https://www.wsj.com/articles/microsoft-to-acquire-linkedin-in-deal-valued-at-26-2-billion-1465821523.

"complete overhaul of [LinkedIn's] technology architecture."[18]  The new version was meant to make the user experience "seamless across mobile and desktop."[19]

17.    "According to LinkedIn's quarterly SEC filings, the professional networking site makes money [largely] through its … premium subscriptions—in other words, by selling … and membership privileges."[20]  "LinkedIn Premium is a powered-up version of the freemium basic account.  The service follows a subscription model with additional features such as InMail, insights and analytics, and unlimited search[, and is] one of LinkedIn's revenue streams[.]"[21]  Through LinkedIn Premium, Defendant provides subscribers with different tiers of access to, among other things, InMail messages, the ability to see who has viewed a profile, and interview preparation content.  Additionally, in "February 2017, following the company's acquisition by Microsoft, LinkedIn added new features to its LinkedIn Premium subscription plans," such as "educational courses … on LinkedIn Learning, an online MOOC service the company repackaged in September 2016 after its 2015 acquisition of Lynda.com."[22]

18.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% percent a year

---

[18] LinkedIn Pressroom, *Introducing the New LinkedIn Desktop* (Jan. 19, 2017), *available at* https://news.linkedin.com/2017/introducing-the-new-linkedin-desktop.

[19] *Id.*

[20] Investopedia, *How Does LinkedIn Make Money?* (Sep. 22, 2019), *available at* https://www.investopedia.com/ask/answers/120214/how-does-linkedin-lnkd-make-money.asp; *see also* Global Data, *LinkedIn Annual Revenue (2017 – 2021, $ Million)* (2021), *available at* https://www.globaldata.com/data-insights/technology--media-and-telecom/linkedin-annual-revenue/ ("LinkedIn revenue is mainly driven by demand … for subscriptions to talent solutions, learning solutions, sales solutions, and premium subscription offerings, as well as member engagement[.]").

[21] Finances Online, *Number of LinkedIn Users in 2022/2023: User Demographics, Growth, and Revenue* (Jan. 14, 2022), https://financesonline.com/number-of-linkedin-users/.

[22] https://www.cio.com/article/2877153/why-linkedin-premium-is-worth-the-money.html.

over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[23]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[24]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[25]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[26]

19.    The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[27]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[28]

---

[23] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[24] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *available at* https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

20.    However, as the *Washington Post* has noted, there are downsides associated with the subscription-based business model.[29]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[30]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[31]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[32]  As these companies have realized, "[t]he real money is in the inertia."[33]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[34]  That is, to facilitate consumer inertia, a number of companies engaging in subscription-based e-commerce, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by [among other things] intentionally confusing users with their [website or] app's design and flow, by making promises of 'free trials' that

---

[29] Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[30] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[31] *Id.*

[32] Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[33] *Id.*

[34] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic-renewal programs.[35]

21.    To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[36]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[37]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[38] widespread utilization of these misleading dark patterns and deliberate omissions persist.

22.    Defendant has successfully implemented this tactic.  Significantly, just before its acquisition by Microsoft in 2016, Jennifer Lin, the Senior Product Marketing Manager for LinkedIn Premium, publicly voiced concerns that "[m]any of these members use LinkedIn's free offerings, but have not taken advantage of its … monthly subscription services."[39]  Thus, to

---

[35] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[36] Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[37] *Id*.

[38] *Id*.

[39] Jennifer Lin, *LinkedIn on LinkedIn: How we build our base of LinkedIn Premium subscribers* (2016), https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/case-studies/pdfs/0516016_LinkedIn_LOL_CaseStudy2_MM.pdf.

increase the number of paid subscribers to LinkedIn Premium, Defendant's marketing team began to "distribute[] personalized Sponsored InMail messages that … explain the value of the Premium subscription and offer a month-long free trial."[40]  This marketing campaign evidently worked, given that by the third quarter of Fiscal Year 2016, "Premium Subscriptions revenue increased 17% year-over-year to $162 million."[41]  By late 2018, "LinkedIn was the 21st biggest website in the world, and 10th in the US."[42]

23.     Since then, Defendant's growth has showed no signs of slowing.  "LinkedIn made a revenue of $7.13 billion, $8.37 billion, and $11.56 billion in the years 2019, 2020[, and] 2021 respectively."[43]  Halfway through FY 2021, "LinkedIn's yearly revenue [had already] surpassed the $10 billion mark, a rise of almost 27% from the previous year[.]"[44]  As LinkedIn's Chief Operating Officer ("COO"), Daniel Shapero, noted in a press release, this achievement of hitting eleven figures in profits for the first time since its inception marked "an incredible

---

*See also* LinkedIn Corporation, 2015 Annual Report (Form 10-K), *supra*, at 22 ("In order to grow our business, we must continually attract new customers, sell additional solutions to existing customers *and reduce the level of non-renewals in our business*.  Our ability to do so depends in large part on the success of our sales and marketing efforts. … If we do not attract new customers or if our customers do not renew their agreements for our solutions, renew on less favorable terms, or do not purchase additional functionality or offerings, our revenue may grow more slowly than expected or decline.") (emphasis added); *see also id.* at 28 ("We recognize most of the revenue from sales of our … Premium Subscriptions (which include Sales Solutions) over the terms of the agreements, which is typically 12 months.  As a result, a significant portion of the revenue we report in each quarter is generated from agreements entered into during previous quarters. Consequently, a decline in new or renewed agreements … will negatively affect our revenue in future quarters.") (emphasis added).

[40] *Id.*

[41] LinkedIn Pressroom, *LinkedIn Announces Third Quarter 2016 Results* (Oct. 27, 2016), *available at* https://news.linkedin.com/2016/linkedin-announces-third-quarter-2016-results.

[42] https://www.businessofapps.com/data/linkedin-statistics/

[43] WhatIsTheBusinessModelOf, *LinkedIn Business Model: How LinkedIn Makes Money* (Oct. 5, 2022), *available at* https://whatisthebusinessmodelof.com/business-models/how-linkedin-makes-money/; *see also id.* (noting that "[a]t this growth rate, Microsoft might soon witness a year in which LinkedIn generates as much revenue in a year as Microsoft paid to acquire it").

[44] Global Data, *LinkedIn Annual Revenue (2017 – 2021, $ Million)* (2021), *supra* note.

milestone for LinkedIn[.]"[45]  This achievement was due, in part, "to COVID-19, [as a result of which] there was an influx of new members, which resulted in 31% membership growth during the lockdown period as well as a 16% increase in revenues."[46]  Thus, Defendant took advantage of the vulnerability of the consumer market during the pandemic and thereby enjoyed rapid growth to its paid LP Subscription user-base in light of the fact that overall time spent on the internet more than doubled since March 2020, when the U.S. and other countries largely shut down due to COVID-19.  Yet, even still, "LinkedIn would like to broaden the base of people shelling out money for its premium membership[.]"[47]  Indeed, its 2021 milestone only intensified Defendant's drive to increase subscription revenues at any cost.  For instance, "[w]ith a $10 billion dollar feather in its cap, [in the latter half of FY 2021] LinkedIn [wa]s looking to turn up the fire on its steady simmer of growth by expanding its experimental premium publishers paywall initiative dubbed LinkedIn Premium News[, which is] … an add-on service to LinkedIn's Premium members who gain access to content supported by [] paywall services."[48]  Subsequently, "[i]n the fiscal year 2022, LinkedIn's annual revenue amounted to more than 13.8

---

[45] Daniel Shapero (COO at LinkedIn), *LinkedIn hits $10B in revenue by helping companies connect with talent and customers* (Jul. 28, 2021), *available at* https://www.linkedin.com/pulse/linkedin-hits-10b-revenue-helping-companies-connect-talent-shapero/?trk=read_related_article-card_title ("Yesterday, we shared an incredible milestone for LinkedIn: we achieved $10 billion in revenue in fiscal year 2021, up 27 percent from last year. … Since our acquisition by Microsoft, **our revenue has nearly tripled**[.]") (emphasis added).

[46] Finances Online, *Number of LinkedIn Users in 2022/2023*, *supra* note.  *See also* SocialMediaToday, *LinkedIn Up to 722 Million Members, Continues to See 'Record Levels of Engagement'* (Oct. 28, 2020), https://www.socialmediatoday.com/news/linkedin-up-to-722-million-members-continues-to-see-record-levels-of-enga/587956/ ("Given more people are looking for work amid the COVID-19 pandemic, it's little surprise that LinkedIn has seen increased usage, with parent company Microsoft reporting that the professional social network saw 'record levels of engagement' - up 31% - in the most recent quarter.  The findings are listed in Microsoft's FY21 Q1 report, which the company published this week, outlining its key performance highlights in the period. … Microsoft says that it expects LinkedIn's revenue growth to continue[.]") (emphasis added).

[47] Digiday, *LinkedIn looks to premium publishers as a way to drive subscriber revenue* (Jul. 27, 2021), https://digiday.com/media/linkedin-looks-to-premium-publishers-as-a-way-to-drive-subscriber-revenue/.

[48] MSFT, *LinkedIn looks to expand its 'Premium Platform' after announcing $10B annual revenue* (Jul. 28, 2021), https://www.onmsft.com/news/linkedin-explores-premium-publishes-platform.

billion U.S. dollars, up from eight billion U.S. years during the 2020 fiscal period."[49]  Thus, by all accounts, "it seems that LinkedIn is faring pretty well[ in the post-COVID consumer market], with Microsoft reporting a 34% YoY increase in LinkedIn revenue to $3.44 billion, while it's also continuing to see 'record levels' of user engagement."[50]

24.    Today, Defendant's LinkedIn Platform is the "world's largest professional network," with "more than 850 million members in 200 countries and regions worldwide" and more than 191 million members in the United States alone, as shown in the image below.[51]  Of that total, approximately "39% of LinkedIn users pay for LinkedIn Premium."[52]



[49] Statista, *Annual revenue of LinkedIn from 2017 to 2022* (Oct. 10, 2022), *available at* https://www.statista.com/statistics/976194/annual-revenue-of-linkedin/.

[50] SocialMediaToday, *LinkedIn Continues to See 'Record Levels' of Engagement, Revenue Up 34%* (Apr. 26, 2022), https://www.socialmediatoday.com/news/linkedin-continues-to-see-record-levels-of-engagement-revenue-up-34/622752/.

[51] LinkedIn Pressroom, "About Us," *supra* (last accessed Oct. 21, 2022).  *See also* SpendMeNot, *LinkedIn Revenue Statistics That You Can Learn From* (Aug. 10, 2021), *available at* https://spendmenot.com/blog/linkedin-revenue-statistics/ ("The biggest market of LinkedIn users is the USA[.]").

[52] Kinsta Blog, *Mind-Blowing LinkedIn Statistics and Facts (2022)*, *supra*; *see also* Finances Online, *Number of LinkedIn Users in 2022/2023*, *supra* ("Premium users are <u>39% of LinkedIn's subscriber base</u>.  [Based on a (now outdated) 2018 estimate of approximately 605 million paid subscribers, t]hat's <u>236 million users that could net $7.1 billion in potential subscription revenue based on the lowest Premium Career subscription tier</u>.") (emphasis added).

B.    **Online Consumer Complaints About the LP Subscriptions**

25.    Defendant's recent growth in revenues and subscriber count with respect to its LP Subscriptions coincides with a sharp decline in subscriber satisfaction as the LP Subscriptions and the platforms from which they operate have become riddled with "dark patterns."  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[53]  Indeed, as one article from UX Shots has suggested, LinkedIn is among the "[m]any successful leading companies [that] use these unethical design tricks to deceive users."[54]  Specifically, the blogger accused LinkedIn of obscuring price information in order to stimulate enrollment in paid subscriptions:

> LinkedIn asks its users to upgrade their account to LinkedIn premium without giving them the cost.  They make it difficult for users to compare the price for different plans offered by hiding them in the detail section that appears only on clicking a particular plan.  As you see, the price is displayed in a small grey font making it less prominent to users.  By not displaying the price evidently, an unnecessary cognitive load is created forcing them to proceed with the plan recommended by the site.[55]

Other reviewers have described this as the dark pattern called "Price Comparison Prevention."[56]

Another blog post describes the process for cancelling a free trial subscription to LinkedIn

---

[53] *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[54] UX Shots, *Dark Patterns: The darkness in UX* (June 3, 2020), https://uxshots.in/2020/06/03/dark-patterns-the-darkness-in-ux/; *see also* HUBSPOT BLOG, *Understanding the Difference Between Dark Patterns and Conversion Optimization*, https://blog.hubspot.com/customers/difference-dark-patterns-and-conversion-optimization ("So why do companies resort to using dark patterns on their websites?  In short, dark patterns make it easy for a company to drive up conversion rates.  The internet is a content-rich space.  Every company is battling for each visitor's personal attention, information, and resources. Even larger corporations such as … LinkedIn are guilty of making these types of design choices.")

[55] *Id.*

[56] "LinkedIn is an example of keeping users from comparing their premium plans against each other. To see the individual price tiers, you have to navigate to a separate page on their site. … [This is] forcing [users] to jump through an extra hoop to properly compare the price of each premium tier."  THE GOOD, *Dark Patterns: The Ultimate Conversion Blocker for Ecommerce Websites* (Sep. 4, 2020), *available at*

Premium before automatic renewal as "a masterpiece of deception" that is riddled with dark

patterns.[57]  Further, one Redditor noted that "LinkedIn takes clickbait to a whole new level" and

that it is "almost impossible to X out of a notification without accidentally clicking on their

premium upgrade."[58]

     26.    As described herein, Defendant has been using various types of dark patterns,

including but not limited to "interface interference" and "preselection,"[59] "roach motel,"[60]

"misdirection,"[61] and "forced continuity,"[62] in order to prevent user unsubscription from the LP

---

https://thegood.com/insights/dark-pattern-ecommerce-ux-design/; *see also* Arushi Jaiswal, *Dark Patterns In UX Design*, WORDPRESS (2017), *available at* https://irenelopatovska.files.wordpress.com/2018/03/dark-patterns-in-ux-design-assignment-3-arushi.pdf ("In this pattern, Brignull explains that the retailer makes it hard for the user to compare the price of an item with another item, so they cannot make an informed decision.  * For example, LinkedIn always advertises its Premium plans and gives its users free trial but never reveals the price of it in the first place.").

[57] *See* "Dark patterns & software ethics" (Sep. 28, 2019), https://dimosr.github.io/dark-patterns/ (noting that, while "dark patterns have become commonplace nowadays[,]" "what I experienced [in trying to cancel a Premium Business free trial subscription] is beyond anything I have seen so far"; describing "reversal of action buttons, where what I wanted to really do is presented as the fallback option, while the default option is what the company really wants" and branding Defendant's deliberately over-complicated and counter-intuitive multi-step cancellation process as a "*masterpiece of deception*") (emphasis in original); *see also id.* ("[Despite this,] I've managed to go through all these stages.  Yet, a couple of days later I received an e-mail from Linkedin saying that there is a pending payment for my Premium subscription.  This means there was probably some other trick that I didn't identify and fell victim of.") (emphasis added).

[58] *See* REDDIT, *available at* https://www.reddit.com/r/videos/comments/5sim88/linkedin_takes_clickbait_to_a_whole_new_level/ (original post with link to YouTube video, dated Feb. 6, 2017); YOUTUBE, https://www.youtube.com/watch?v=FcGhYZm2Wu8 (features video linked to Reddit article); *see also* https://news.ycombinator.com/item?id=20464486 (original post, dated July 18, 2019), ("[LinkedIn] uses dark patterns with the same gusto that a wolf has for a lamb ranch. I thought they were widely known for their scummy tactics."); https://news.ycombinator.com/item?id=9045677 ("[S]pam IS the LinkedIn business model and it's not coming from 3rd party apps that have access to the API – it's coming from LinkedIn's main site and the (premium) features they offer."); *id.* ("[LinkedIn's] UI is full of dark patterns and the only thing I ever got out of their service was recruitment spam from people that hadn't actually read my profile.").

[59] *See* https://darkpatterns.uxp2.com/pattern/linkedin-tricked-into-email-spam/.

[60] "Roach motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)."  https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[61] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening." https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[62] One example of "forced continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service [that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The

Subscriptions by adopting complex cancellation procedures to increase the friction in the subscription cancellation process.  Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of their automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their LP Subscriptions.  It has further led to an increase in accidental or unintentional sign-ups by consumers for paid LP Subscriptions plans, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.

27.    Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's broken promises.  For instance, numerous subscribers have left scathing reviews on the Better Business Bureau website, complaining of the unclear billing practices and confusing cancellation policy associated with the LP Subscriptions, especially with respect to Defendant's "free trial" offers and consumers' inability to make contact with Defendant regarding the same:[63]



**Complaint Type:** Billing/Collection Issues    **Status:** Answered ❓

07/07/2022

I have been attempting to cancel my "premium subscription" on LinkedIn multiple times over the passed two years and I am still getting charged $59.99 a month for a subscription I do not want. I have gone through the Cancellation steps provided on their site without any luck.... I've tried to call on every number possible... When you call the Merchant Number provided by \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* dispute services, the number does not work. If you call the Corporate phone number listed on \*\*\*\*\*\*, the automated message mentions their company Address, then the call is disconnected. I've attempted to contacted their support team via their website and have never been contacted regarding my complaints. I've tried to cancel my account for the past couple of years.... I recently downloaded \*\*\*\*\*\*\*\* and attempted to cancel through them, and they are not able to execute cancellation. I've spent \*\*\*\*\*\*\*\*\* of unwanted dollars with LinkedIN and have no clue what to do at this point.

---

subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

[63] *See* https://www.bbb.org/us/ca/sunnyvale/profile/social-media-marketing/linkedin-corporation-1216-239807/complaints.



07/13/2022

I had not authorized this transaction for Linked in. I signed up for a 1 year job profile in 2020 but not for a recurrent charge. I called both the numbers on the bill************* ( rang then went dead line) ************ (rang a few times then went busy). I want to be refunded my full amount of $****** with no future charges made to my credit card. Thank you,



07/07/2022

On June 13th I opted for a free trial for a job posting on LinkedIn. After the trial it's $31 per day. They said they would email me and remind me that the trial will end. I received the email and decided that I saw no difference in those days that would justify such a cost. The email simply read "edit or close your job at anytime." So I opened a case on the 15th, the morning I received the email to get clarification. When i went to manage the add, there was no way yo discontinue the trial or not be satisfied with it. Of course no one responded within the day so I closed the job posting to prevent any charges. The next morning I see that I received a response that the only way to get out of it was to close the job and repost. I logged in to verify that my post was not active and it wasn't. So I did just what they said I reposted the add on the 16th and I verified that the new posting was free and went on my way. Then this morning I received a bill for $******. I have opened a case but i cannot call, I can't even chat since I don't have a premium account. I am really just a nobody waiting for an email to tell me sorry about that, there's nothing we can do. I also think that live chat should be available to all customers. This company provides almost no support unless you have money to pay for it. I want them to tell me what happened and I want my money back. Looking at the issue and the charges I didnt get any more applications than Normal so what is going on? I want to know what went wrong and I want my money back! If I was being charged, it wasn't obvious. After posting my new job post I was never contacted or notified that I had an add running or that fees were being charged. It was hidden. I was on the account often and it should be in plain sight of what someone is spending! I want them to fix it. I want my money back and close my entire LinkedIn account. I feel everything has been very deceptive.

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 



07/05/2022

I was charged with the premium, with no email telling me, my account was going to be charged. I would like a refund for the price of 39.99

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 



06/28/2022

I've cancelled my LinkedIn Premium account and they keep taking the charge out of my checking account and they have no way to reach a customer service person. They owe me almost $500.



06/02/2022

I was charged for premium service and did not do so, I would like my money back.

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 



05/19/2022

On May 17, 2022, my bank account was debited for $****** for a "premium" membership to Linkedin Corporation. First of all, I didn't know there was such a thing as a premium membership. I have never taken any courses through Linkedin. I have never found a job through Linkedin. I had a resume on their website and I had friends on there from work but I never was on Linkedin over a dozen times. I had no idea there was a charge. If I had known this, I would have never put anything on there. I make $*** per month as a retired teacher by the time my health insurance is taken out. The rest of my income comes from subbing and making $90 per day when I work. I now have $*** left in my checking account. I would have had around $*** until this was done to me. I cancelled my account. This money was taken through ******* and through a ******* account that I don't even use and haven't used in forever. It is simply attached to my checking account. I am very upset about this and very angry. I had no idea this was even a membership service. I thought if you took courses through Linkedin that you paid a few for those. I had no idea that I was paying an exorbitant fee to have a resume on their site. I am still unemployed as it was of no use to me and I am $*** poorer than I should be. I want the money returned to me through ******* or to my bank account.



05/02/2022

My husband accepted a free trial from LinkedIn. They then charged him $**** without notice. They claim an email was sent but it just have gone to junk.

**Complaint Type:** Problems with Product/Service    **Status:** Answered 



05/16/2022

I tried to 'close my account' with LinkedIn. Needless to say, I wasn't able to, despite going through all the hoops. I am outraged by this unethical money grab by this disgusting company. They want you to get annoyed, and give up. Shame on all of them. You can see from my attached photo that the 'DONE' button doesnt light up, which means, I cant close my account. This is DELIBERATELY being done by this company, dent come back to me with 'its was a error', 'there was something wrong with the app'. STOP LYING.

**Desired Outcome**
Refund; Modification/discontinuance of an advertised claim; Contact by the business

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 



05/10/2022

Signed up for a trial for their learning services. They charged my account before the one month trial was over. I started a chat support session with one of their reps who told me that they had cancelled the account and that I would receive a refund. That took place on the 29th of April, it is now the 9th of May. WHERE IS MY REFUND!!! AND WHY DID YOU CHRGE ME BEFORE THE TRIAL ENDED! I WANT MY REFUND AND MY MONEY BACK NOW! I have also attached the email correspondence with your representative.

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 



05/09/2022

I recently was notified by Paypal if a $100 charge to my bank. I was aghast. I am very low income and retired. Somehow, and I swear as truthful, I have no recollection of purchasing or even trying their expensive plan. I was on the site looking for someone but did NOT subscribe. If it looks like I did it was in error and I have no idea other than that I was between screens and may have gotten confused with the person-finder I reviewed online ($35). So this is a huge chunk of change to me, my food for the week. Furthermore, LinkedIn has made it impossible to contact them. No email, text, phone anywhere. Kind of a scam when you can't get service at all or it is impossible to locate unless you are IT. I am not. Just a health educator gone to seed. Hungry in SF. I cannot attach paypal screenshot because of their security. Here is bank:

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 



05/03/2022

I subscribed for a premium membership through LinkedIn but canceled it a few days after subscribing. I was recently charged a membership fee through my bank account despite having canceled the membership. I would like a refund. There is no way to contact anyone directly. I did send in a request to have my account reviewed. This automatic renewal should not have occurred.



01/26/2021

Premium service is renewed without authorization nor notice. On Friday Jan 22 LinkedIn charged me for a 1-year premium subcription I did not want after a trial period. No notice was given that the charge was going to be made nor can you reach anyone in their customer service department to rectify the situation.

**Desired Outcome**
Refund

**Complaint Type:** Problems with Product/Service    **Status:** Answered ⓘ



01/26/2021

Was wrongfully charge a year subscription of LinkedIn learning premium. Signed of for LinkedIn learning course premium did not use it and canceled but money was still pulled for a year from bank account. I did not authorize this for a year. Please refund

**Desired Outcome**
A refund please

**Complaint Type:** Problems with Product/Service    **Status:** Answered ⓘ



01/14/2021

Refute fraudulent charges on bank statement by ********* done without my knowledge. Hello, I called my bank last month to refute a charge of *** last month. I was issued a new bank card because I thought someone got a hold of my debit card. Once I received my new card, another charge for the same amount was placed on my card again without my knowledge. I do not have a ********* account and made no such transaction. My bank tells me that the charge is a subscription charge and was made through the merchant wallet on my phone. Now tell me, what subscription services charges someone without a email receipt? Or even a means of contacting the company for support? I am also furious that ********* does not have a customer support call line and that I have to wait to hear from them via email for a charge that I simply did not make. I am also upset that this can even happen. Where did I sign or click to agree on this transaction. This needs to be resolved immediately because I have no problem getting legal help to solve this issue.



01/13/2021

LinkedIn committed fraud and stole ****** from my bank account, signing me up for a service I did not ask for. I want my money back immediately. I received a notice from LinkedIn stating that my Premium service was subject to end IF I did not update my payment information. Because I did not want to renew the service, I did not update my payment information. Then I checked my bank account today to discover that they had stolen ****** from my account. I say "stolen" because I did not ask to continue this service, and the message they sent said it would end IF I did not update my payment information. I tried to find a way to contact the business directly, but of course, they don't provide you with any customer service information. The "chat" feature is disabled, and there is no phone number or email address available. When I tried the "review my account" option, I pressed the submit button a dozen times and nothing happened. Thus, the organization STOLE my money. I demand that they refund it IMMEDIATELY. I will never, ever sign up for their premium service again, I assure you. I have already canceled it on my LinkedIn account to make sure it doesn't happen again. This is FRAUD and they should be held accountable. And, as if it's not already a horrible and fraudulent action that should be punished, they did this at a time when my business is suffering, and I am trying to live on unemployment, so I most definitely do NOT have ****** to burn. REFUND MY MONEY IMMEDIATELY. I am attaching a screenshot of the charge for further verification.

**Desired Outcome**
I demand a full refund and verification that the Premium account is cancelled. I believe I successfully cancelled it today online, but I want verification that it is cancelled and I will never be billed again. I would also like to see LinkedIn held accountable for their actions and made to send out billing statements as Google Business does long before the payment is actually due. The way their "notice" is written, the consumer is led to believe that if they do nothing, the account is closed. Obviously, that is not the case.

Page 26 – FIRST AMENDED COMPLAINT

**Complaint Type:** Problems with Product/Service    **Status:** Answered ⑦

01/04/2021



Unauthorized charge Hello, I received an unauthorized charge yesterday (merry Christmas to me I guess) from LinkedIn of about $70. I did not sign up for this. I didn't know what this was for. I tried contacting therm, but they don't have a customer service line. How sketchy is that? I tried through PayPal but PayPal did NOT resolve. Please help refund this bizarre charge. I thought LinkedIn was free! These are hard times in society, I can't be getting charged for purchases I didn't make. Please help

**Desired Outcome**
I want a full refund. I did not make a purchase.

01/11/2021



I subscribed in response to an ad saying the price was about *** per month. On January 1 they took the whole year's cost out of my checking account. I was logged into LinkedIn and saw an ad to sign up for their LinkedIn courses with a LinkedIn Premium account for about *** per month. I signed up. I never agreed to anything saying that a full year's cost would be deducted all at once on January 1. I signed up for what the ad said, about *** per month. On January 1, 2021, I found that **** had been drawn from my checking account by LinkedIn. I never agreed to pay the whole thing in 1 lump sum payment. I would never have agreed to this voluntarily. I am a senior citizen living on Social Security and I don't have that much money. I agreed to monthly payments. The ad I clicked specified an amount in the range of *** per month. Their entire customer service system is online with multiple choices. My issue does not fit into any of the multiple choices. Their choice for reviewing an account does not contain a form where you can write in what your issue is. The help page says that that at the bottom of the help page there is a choice for a chat, but no chat agent appears there. There is nothing to click on for a chat. They have no customer service 800 number to call. Everything is automated. They have no dispute resolution. I saw someone with the title of public affairs on LinkedIn, so I sent that person a message. Note that they did the withdrawal January 1, so that you can't call the bank and stop the payment, because the banks are closed on that day.

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⑦

12/10/2020



********* charged my credit card ******* without my consent. Tried contacting them no luck. Their website has no way to contact them , no e mail . no chat. All links to contact them are a dead end .

**Desired Outcome**
Full refund

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⑦

12/09/2020



This company charged me ****** and will not refund me. It was a Trail period and i never received a warning about it ending. the trial period was not even purposely setup!

**Desired Outcome**
I want my money back! i never even use the paid services!

Page 27 – FIRST AMENDED COMPLAINT

**Complaint Type:** Problems with Product/Service    **Status:** Answered 



12/08/2020

Product/services complain Recently, LinkedIn provided a free membership trial to me. I accepted the offer. I soon being charged for a whole year membership without any notification for expirations. The only notification I have received is from PayPal about the payment. When I try to cancel the membership the same day I receive the payment, they only have cancel membership and lose credit option for me. That's really unethical of a whole year annual membership charge without customer's notice and consent. I tried to contact LinkedIn customer service, no one answer the phone and the website has no option for me to further assist. I submitted account review and the only reply I get is no premium subscription. Is this forcing us to accept a service that we don't need?

**Desired Outcome**
I want to have a full refund. Please have a better function about your membership billing services.

**Complaint Type:** Problems with Product/Service    **Status:** Answered 



12/04/2020

I recently joined Linkedin Learning services but after a couple of months I decided to cancel my subscription since I barely use it and after I got changed in advance for December, I contacted Linkedin but they denied the cancelation and refund for whole month because they claimed they charge in advance and no refund is applicable. since they have the option to grant me access or remove my access at any moment they should be able to refund what's not used, the only way to contact Customer service is through text (no phone number) and they're replies are totally unpolite.I just want my $29.99 dls back since they charge for the whole period and I'm not using it. Product_Or_Service: Linkedin Learning Services Order_Number: ********** invoice

**Desired Outcome**
Other (requires explanation) since they texts from Customer Service are just cut and paste responses, I would like to talk to a human being and get my money back for a service I'm not using and I don't want anymore.

**Complaint Type:** Problems with Product/Service    **Status:** Answered 



10/29/2020

Cancelled service, charged anyway and no way to communicate with the company directly I signed up for a premium recruiter service trial with LinkedIn. I very specifically recall cancelling the trial because I was unable to find candidates using their service. When the 30 day trial was over I was charged anyway. I receive instant notifications when I am charged for services and I immediately attempted to contact LinkedIn the moment I was charged. I found that it is completely impossible to contact this company directly. There is zero customer service. I attempted to contact them via my bank, via contesting the charge, but because I was unable to contact LinkedIn to obtain proof of the cancellation, my claim was denied. All I have is the email they sent me on October 9 to tell me that my free trial was ending soon. That was the day I visited the site and cancelled the subscription. When I cancelled the site indicated that I would continue to have the trial for the remainder of the 30 days. The fact that they have no interest in communicating with their customer base is ridiculous. I have certainly seen websites where it is difficult to find the contact link, and more difficult to find a phone number, but it is impossible to find EITHER with LinkedIn. They have a monopoly on this particular service - being the Facebook of career professionals - so they can simply charge people, say no refunds, and block and form of communication with them without any consequence. They are a monolith and the consumer has zero chance, it is unfair business practices.

**Desired Outcome**
I would like a full refund. *********

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⑦

10/29/2020



I was billed 28 months 35.69 after the one months I ordered, with no invoice emailed to me. On 6/19/2018 I purchased 1 month of LinkednPremium and I made sure it will be only one month by unsubscribing to more, right after I had paid. However, the unsuscribe did not go through as I thought and the subscription continued for a total of 29 months at 35.69 per month, over two years, robbing me of 999 dollars in total, much higher than if I were to subscrib to a one year membership. Why is it legal to bill someone every month without emailing them an invoice? Such business practice should be outlawed. I asked Linkedin for a full refund of 28 months and they only offered me 3 months. Please help me collect the full refund, and please protect other people too from these abusive practices. Thank you. *******************************************

**Desired Outcome**

I am seeking a full refund of 28 months X 35.69, not just 3 months. I would also ask the BBB to compell Linkedin to mail customers invoices for every charges they make on their accounts. My Linkedin billing nr. XXXXXXXXXX *******************

---

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⑦

10/21/2020



I signed up for a free trial but I sure that I canceled it a day after I signed up. Today, they deducted *** from my bank account without notifying me I signed up for a free trial subscription last month but I find it not useful that's why I decided to cancel it. I did cancel the free trial right away and I am 101 percent sure. That was a day after I signed up. Now, I am very surprised that they deducted *** from my bank account without even notifying me. This is a scam. Please help me. I'm afraid they are accessing my bank account details without my permission. I disconnected my paypal from that LinkedIn account just now which happen to be connected from my bank account as well where they deducted the money. Please help. Thank you

**Desired Outcome**

I need my money back. I am a working student. I'm not gonna waste money for something I don't used.

---

**Complaint Type:** Problems with Product/Service    **Status:** Answered ⑦ 

10/07/2020



I never provided my debit card information that was replaced in February and somehow LinkedIn withdrew ******* on September 30, 2020. I pulled up my banking information on Friday, 10/02/2020 and find this transaction. I cancelled my account with LinkedIn immediately. I tried to file a complaint but since I closed my account I no longer had an URL site to provide to them to file the complaint. I called my bank on Saturday and filed a complaint requesting a refund. The bank advised that I requested a Premier account with them which I did not. It would keep asking me and I declined. I never authorized this transaction and with Covid19 I do not have that money. There is no phone number to call and speak with someone. I did not get an email notice advising of this transaction going to take place or a text message prior to. I may be reached on my cell XXX-XXX-XXXX or office XXX-XXX-XXXX from 9 to 5. Thank you, ******* Product_Or_Service: online media

**Desired Outcome**

Other (requires explanation) Reverse the transaction and refund my monies. There is going to NSF fees I get charged with that should not be my responsibility for this transaction taking place. I did not authorize it.

Page 29 – FIRST AMENDED COMPLAINT

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 

10/07/2020

I cancelled my premium account back in May 2020. LinkedIn continued to charge me monthly. I only noticed this last billing cycle that I was still being charged. I submitted a ticket to LinkedIn and the agent refunded last month's bill, but refused to refund the full amount.

**Desired Outcome**
I am requesting that I be reimbursed for the full 4 months in which I was paying for a service I did not receive after I had cancelled the service.

**Complaint Type:** Problems with Product/Service    **Status:** Answered 

10/05/2020

can not talk to anyone about getting a refund. I cancelled the service. I need a refund! no answer on phone or chat. Yesterday my account was charged $65 for a premium membership that I did not subscribe to. I cancelled the subscription as soon as I got the notification for the charge and tried to call linkedin but no answer. I left messages and tried to use live chat. This customer service is non existant and unacceptable for a company such as this. I need help now. What do I do?

**Desired Outcome**
I need a refund.

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 

10/02/2020

This company charged for a service I didn't want. I tried it for a week and cancelled the service. I found it unfriendly and hard to use. I ordered this program in July 30, 2020. I ordered the sales navigator service. I paid ******* for this service. I cancelled it a week later. And I waited for a month for fees to be refunded. No refund. I told my credit card and they weren't able to help me. I didn't like the program. And I find them unfriendly to work with. I cancelled and I want my full refund back. Their cancellation service is also unfriendly. They don't give the option to get a full refund back and that's a lot of money and It's useless to me.

**Desired Outcome**
A full refund please and cancellation of service and account on LINKEDIN.

**Complaint Type:** Problems with Product/Service    **Status:** Answered 

09/04/2020

Canceled premium LinkedIn February 2020. Been charged every month since. No response from customer service. Owed over *** dollars at this point. Used credit card. Canceled through normal site directions. Have reached out 4 times to customer service, no answer. Owed *** dollars.

**Desired Outcome**
I am looking for a refund plus pain and suffering.

09/04/2020



I tried to contact LinkedIn as they charged me $600 to renew my subscription and I wanted to move it to monthly or cancel. I tried to contact LinkedIn to resolve a billing issue for my premium subscription. They do not provide a phone number, and they keep kicking me off the chat only leading me to submit a support ticket. When I try to submit the support ticket the submit button is not working so basically I am unable to contact anybody to help resolve my issue.

**Desired Outcome**
Either a full refund or to change my billing to monthly

08/17/2020



I request a full refund of ****** for two months of a Premium Subscription. It's apparent that LinkedIn is trying to scam people and make money by offering a 14 day trial that automatically charges you once it is over. Why did I not receive any email notification that I would be charged, twice? I have also asked for review of my account twice in order to receive a refund, but still have not heard anything and cannot easily find a way to contact someone for help. It's terrible business practices that I have to come here to request a refund. During a time when the entire world is trying to help one another out, and businesses are being more accommodating than ever, and a time when more people are looking for employment opportunities than ever before - LinkedIn is capitalizing on the fact that people will forget to cancel their free trial. I did not intend to dole out this much hard earned money, and it makes me sick that LinkedIn has me going to these lengths to get it returned. If I do not receive this refund, then I think LinkedIn is operating with extremely unfair business practices and is ultimately a corporation that cares about their bottom line instead of human beings just trying to live and find employment opportunities.

**Desired Outcome**
I would like a full refund of *******

08/12/2020



LinkedIn will not allow me to cancel my free trial subscription and will not allow me to close my account because I can't downgrade from Premium. LinkedIn is playing cute games by not allowing me to downgrade from the free premium trial, which upon expiration is a whopping **********! It's a miracle LinkedIn is still a service for that outrageousness. The system tells me I must first downgrade from the free subscription before I can delete even though I have tried multiple times. The links and pages just refresh saying the same indicators. It really feels like LinkedIn attempts to trap people with technological errors not allowing you to find readily how to delete. Please get me off this junk, now.

**Desired Outcome**
Get me off your **** plan and leave me off forever.

07/27/2020



I was charged for a subscription without my consent I was charged for a subscription to their service without any consent on my part. I never authorized these charges, nor did I ever agree to a trial subscription where it stated that my account would be charged in the future. I received no communication of any agreement I entered and I never received any confirmation any purchases I made or indications of future charges.

**Desired Outcome**
I would like to be refunded the full amount of $*******.

07/21/2020



Not able to cancel a trial promotion because your site could not be reached. My trial subscription ended but I could not get a hold of your company. The site that was on the cancelation form went to a page that would not open.

**Desired Outcome**
Please refund the money you took from my account.

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⑦

06/25/2020



This business keeps taking money from my bank account months after I canceling my Premium Subscription. There website will not even allow me to cance Linked in keeps taking my money out of my bank account. And after doing this they won't even allow me to cancel. At this point it is stealing my money.

**Desired Outcome**
I want my money for the past two months.



07/09/2020

Free Trial offer from May 31 to Jun 30, 2020; requested cancellation on Jun 30, 2020. Billed for entire year renewal on Jun 30 with no refund option. Multiple issues: Use of bait and switch tactics with no options to contact customer service to speak to an actual representative. INVOICE states the following...."Notes:1 You'll pay ****** each year (plus tax) once your free trial ends on Jun 30, 2020 until you cancel. Learn how. Prices may change". Cancel requested on Jun 30, 2020 processed on Jul 3, 2020 says renewal stands through Jun 2021. There is no method to request the cancellation to take effect June 30, 2020 as per trial period invoice says. The 'cancel subscription' option is simply a button to click. Once clicked, there is no email confirmation that confirms the request was placed on Jun 30, 2020. Documentation can be provided upon confirmation of secure and privacy policies on this complaint.

**Desired Outcome**
I am requesting the cancellation to take effect Jun 30, 2020 as requested and a full refund of the annual premium subscription of ******; holding them to their NOTE on the invoice.



06/15/2020

I had a 30-day free trial with Linked In. I CANCELLED ONLINE AFTER 2-3 weeks. I was charged anyway, ******** There is no accountability. No recourse. Date of promotion: 5/13/2020 to 6/13/2020 Learning Premium Payment: *** Visa xxx **** Receipt #XXXXXXXXXX Invoice #XXXXXXXXXX Billed to: ********* ****** XXXXX ***** *** ******** ** XXXXX Date: 6/14/2020 Method: Visa ******** Receipt #XXXXXXXXXX Invoice #XXXXXXXXXX Learning Premium Subscription renewal (Annual) From June 13, 2020 to June 13, 2021 ******* You'll pay ****** each year (tax included) until you cancel. Sales tax: ** ***** Invoice: ******* Payment: ******* Balance: ***** I CANCELLED 2-3 weeks into my trial. I received a message saying it was successfully cancelled. I did not receive a receipts/proof for this. I did not use the services I have been charged for and do not intend to. The company makes it impossible to contact customer service by phone to resolve disputes and buries its contact information as a tactic for getting people to give up. After much time trying to go through their app, they finally said I could not receive help with my mobile phone and that I would need to use my computer. Its exhausting. I am homeless, living in my car, was looking for work and now this happens. I now cannot pay my phone bill which will impair my ability to obtain employment. This is the opposite of what Linked In is suppose to help people accomplish.

**Desired Outcome**
I want my ******* refunded to my account. I want Linked In to be warned of operating deceptively and using business tactics that lack integrity.

**Complaint Type:** Billing/Collection Issues     **Status:** Answered ⑦



07/27/2020

Linkedin Premium subscription cancellation I started a Linkedin Premium subscription last month in June 2020 and my spouse did the same a month earlier. Evidently, and as demonstrated through Linkedin's own policies, Linkedin depends on its members' ability to not notice charges on their credit card statement or give up efforts to cancel their account or give up efforts to contact customer care for support because at every stage of these workflows Linkedin deliberately makes it harder than normal for the member to utilize any of the options that would help member either cancel their subscription or contact customer care for support. Starting a Linkedin Premium subscription is so easy, just click and it's done. Canceling a premium subscription however is another ballgame. Linkedin purposefully makes it difficult for people who intend to cancel their subscription by hiding and obscuring any option to cancel through its website or mobile app. To reach the cancellation page, one has to jump through many hoops. Further, just submitting a cancellation request is not the end of it. Once a cancellation request is submitted, Linkedin then actively tries to charge the billing method. And once that happens, finally, it deliberately hides options to contact customer service through Chat or even register a support ticket. Linkedin Premium Subscription email clearly states I have till 7/26 to cancel my Linkedin premium. However Linkedin conveniently charged my credit card 7/26, one day before the trial end period. This pertains to Linkedin user: ***********@gmail.com Secondly, for my spouse's Linkedin account, Linkedin Premium Subscription center doesn't allow users to cancel subscription until the day after the 30 day trial is over. And even after canceling the premium subscription on 31st day, system charges for the entire month. The non-usage of Linked subscription is backed by user records that you may easily verify. Through the two examples mentioned above, Linkedin has conveniently charged each member $ 30 despite each members' unwillingness to continue with subscription and non-usage of their respective Premium membership subscription and its features, and despite cancellation on both accounts.

**Desired Outcome**
Refund of membership fees for my and my spouse's Premium membership

Page 32 – FIRST AMENDED COMPLAINT

28.    Indeed, as a result of consumer complaints, Defendant's hidden and frequently

unresponsive cancellation mechanism received considerable attention from the press in 2020:

> A reader alerted me to the problems he encountered trying to cancel his LinkedIn Premium subscription late last week.  He noted the button to cancel subscriptions was removed from the Premium Subscription page, and the link to access payment methods was removed from the Settings page, preventing him from removing his credit card.
>
> A "Cancel Subscription" button was available, but not easily findable in the Help content itself, the reader noted.  After repeatedly hitting the button, he said he received no notice or confirmation that his subscription was cancelled.
>
> This reader wasn't alone in hitting problems. There are nearly 140 messages in the LinkedIn Help forum from users encountering similar problems trying to cancel their premium subscriptions.

ZD Net, *Microsoft is working to fix LinkedIn Premium subscription cancellation problems* (Oct.

14, 2020) (emphasis added).[64]

> Microsoft has acknowledged a bug in LinkedIn that prevents users from easily canceling their subscriptions.  Reports of the problem began being reported in LinkedIn's Help Forum almost two weeks ago, with multiple users claiming that the "Change" option under "Premium Subscription" settings was either unresponsive or did not offer an option to cancel the paid subscription.
>
> The issue also meant that users were billed for an extra term – or more – if they did not successfully cancel their subscriptions or were unaware that the cancellation did not go through, even if the "Cancel Subscription" button was available.  Users also report receiving no confirmation about the status of their cancellation request, adding to the confusion.

Neowin, *Microsoft working to fix LinkedIn bug preventing users from canceling subscriptions*

(Oct. 14, 2020) (emphasis added).[65]

---

[64] *Available at* https://www.zdnet.com/article/microsoft-is-working-to-fix-linkedin-premium-subscription-cancellation-problems/.

[65] *Available at* https://www.neowin.net/news/microsoft-working-to-fix-linkedin-bug-preventing-users-from-

29.     Defendant acknowledges and responds to many of the consumer complaints left
on the Better Business Bureau website.[66]  Moreover, hundreds of LinkedIn Premium users have
left Defendant messages directly in the LinkedIn Help forum on its own website regarding failed
cancellation attempts and other hidden automatic renewal offer terms.[67]  Thus, Defendant cannot
claim a lack of awareness of the fact that its unlawful conduct has caused financial injury to
consumers.

30.     The above reviews are just a sampling of numerous negative reviews consumers
have left about the LP Subscriptions regarding Defendant's missing, vague, and/or
inconspicuous pre- and post-checkout disclosures and the confusing cancellation mechanism
associated with the LP Subscriptions.  As detailed further below, the above online consumer
complaints reveal a widespread pattern of uniform unlawful conduct by Defendant, underscoring
the artifice devised and employed by Defendant to lure and deceive millions of consumers into
enrolling, and remaining enrolled, in its paid LP Subscription programs.

## C.    Background On Relevant Oregon Law

### i.    Oregon's Automatic Renewal Law

31.     In 2011, with the passage of Oregon's Senate Bill 487, the Oregon Legislature
enacted the Automatic Renewal Law ("ARL"), ORS 646A.292-646A.295, with the intent to "end
the practice of ongoing charging of consumer credit or debit cards or third party payment

---

canceling-subscriptions/.  Notably, as consumer complaints evince, these problems concerning the cancellation
mechanism for the LP Subscriptions did not begin in 2020.  *See, e.g.*, Reddit (original post, dated July 8, 2019)
("'Unsubscribe' link in emails broken for anyone else? …."); Twitter (original post by Al Stevens, dated Nov. 23,
2019), *available at* https://twitter.com/occitanemoron/status/1198181699437371392 ("After hunting down the tiny
link I was sure I had cancelled my @LinkedIn premium subscription last month.  Turns out they switch the primary
and secondary button so at a glance you think you are performing the opposite action @darkpatterns") (emphasis
added).

[66] *See id.*

[67] *See* https://www.bbb.org/us/ca/sunnyvale/profile/social-media-marketing/linkedin-corporation-1216-239807/complaints.

accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." ORS 646A.292 (statement of legislative intent).

32.    The ARL makes it "unlawful for a person that makes an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (a)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before a subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer.

> (b)  Charge the consumer's credit or debit card or payment account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms.

> (c)  Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the offer includes a free trial, the person shall also disclose in the acknowledgment how to cancel and allow the consumer to cancel before the consumer pays for the goods or services.

ORS 646A.295(1)(a)-(c). The requirements of 646A.295(1)(a)-(b) "must be met prior to the completion of the initial order for the automatic renewal or continuous service[,]" but the requirements of 646A.295(1)(c) "may be fulfilled after completion of the initial order." 646A.295(4).

33.    Additionally, Section 646A.295(2) of the ARL further provides:

> A person making automatic renewal or continuous service offers shall provide a toll-free telephone number, electronic mail address, a post-office address only when the person directly bills the consumer, or another cost-effective, timely and easy-to-use mechanism for cancellation that must be described in the acknowledgment required by subsection (1)(c) of this section.

ORS 646A.295(2).

Page 35 – FIRST AMENDED COMPLAINT

34.    The term "Person" as used in ORS 646A.295 means "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity except bodies or officers acting under statutory authority of this state or the United States." ORS 646.605; *see also* ORS 646A.293(4) ("'Person' has the meaning given that term in ORS 646.605[.]").  Defendant is a "person" under this definition.

35.    Section 646A.293(1) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term."  Section 646A.293(3) similarly defines "Continuous service" as "a plan or arrangement in which a paid subscription or purchasing agreement continues until the consumer cancels the service."  The LP Subscriptions constitute "automatic renewal" and/or "continuous service" plans under these definitions.

36.    Pursuant to Section 646A.293(5) of the ARL, "Offer terms" means "the following clear and conspicuous disclosures:  (a) That the subscription or purchasing agreement will continue until the consumer cancels.  (b) The description of the cancellation policy that applies to the offer.  (c) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal or continuous service plan or arrangement, and, if the amount of the charge will change, the amount to which the charge will change, if known.  (d) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (e) The minimum purchase obligation, if any."  ORS 646A.293(5)(a)-(e).

37.    Section 646A.293(2) of the ARL defines the term "Clear and conspicuous," in relevant part, as "in larger type than the surrounding text, or in contrasting type, font or color to the surrounding text of the same size, or set off from the surrounding text of the same size by

symbols or other marks, in a manner that clearly calls attention to the language."

38.     Finally, the ARL provides that where "a person sends goods, wares, merchandise or products to a consumer under a continuous service agreement or pursuant to an automatic renewal of a purchase without first obtaining the consumer's affirmative consent as required in [ORS 646A.295(1)], the goods, wares, merchandise or products shall for all purposes be deemed an unconditional gift to the consumer who may use or dispose of them in any manner the consumer sees fit without any obligation to the person including, but not limited to, requiring the consumer to ship, or bear the cost of shipping, any goods, wares, merchandise or products to the person." ORS 646A.295(5).

39.     As alleged below, Defendant's practices systematically violate Sections 646A.295(1)(a), 646A.295(1)(b), 646A.295(1)(c), and 646A.295(2) of the ARL.

### ii.    Oregon's Free Offer Law

40.     In 2011, the same year the Oregon ARL was enacted[68], the Oregon Legislature also passed Senate Bill 292, thereby enacting the Free Offer Law ("FOL"), ORS 646.644, which prohibits businesses from imposing financial obligations on consumers who accept a free offer unless that offer complies with disclosure, consent, and billing information requirements.[69]

41.     For the purposes of the FOL, a "Free offer" means, in relevant part, "an offer of goods or services without cost[] … to a consumer that, if accepted, causes the consumer to incur a financial obligation for[, among other things] … [e]nrollment in a membership, subscription or service contract as a result of accepting the offer." ORS 646.644(1)(e)(A)(iii). Defendant's

---

[68] In fact, the Oregon ARL and the FOL were considered during the same legislative session and as part of the same legislative agenda. *See* Oregon Legislative News Release, *Bill will prohibit misleading and costly automatic contract renewals: Senate takes final vote on SB 487, consumer protection victory for Oregonians* (Jun. 10, 2011), *available at* https://www.oregonlegislature.gov/senatedemocrats/Documents/sdo_061011.pdf.

[69] *See id.* ("The Senate []concurred in final amendments for SB 292 this morning, legislation that prevents sellers from imposing cumbersome financial obligations on consumers who sign up for 'free trial offers.'")

offers for free trials to the LP Subscriptions, which are automatically converted to paid

subscriptions upon expiration of the trial period without further authorization sought from or

obtained by consumers, constitute "free offers" plans under this definition.

42.    The FOL prohibits a person from "mak[ing] a free offer to a consumer, or

impos[ing] a financial obligation on the consumer as a result of the consumer's acceptance of a

free offer, unless the person provides the consumer with clear and conspicuous information

regarding the terms of the free offer before the consumer agrees to accept the free offer,

including[, in relevant part,] at a minimum:"

>   (a)  Identification of all … enrollments in a membership,
>   subscription or service contract, that the consumer will receive or
>   incur a financial obligation for as a result of accepting the free
>   offer;
>
>   (b)  The cost to the consumer of any financial obligation the
>   consumer will incur if the consumer accepts the free offer,
>   including any fees or charges;
>
>   (c)  Any requirement[] … that the consumer take affirmative action
>   to reject the free offer and instructions about how the consumer is
>   to indicate the consumer's rejection of the free offer;
>
>   (d)  A statement[] … that by accepting the free offer, the consumer
>   will become obligated for … enrollment in a membership,
>   subscription or service contract, unless the consumer takes
>   affirmative action to cancel the free offer or otherwise reject … the
>   enrollment in a membership, subscription or service contract;
>
>   (e)  … [T]he consumer's right to cancel the free offer using
>   procedures specifically identified for that purpose that, at a
>   minimum, enable the consumer to cancel by calling a toll-free
>   telephone number or to cancel in a manner substantially similar to
>   that by which the consumer accepted the free offer;
>
>   (f)  The time period during which the consumer must cancel in
>   order to avoid incurring a financial obligation as a result of
>   accepting the free offer; [and]
>
>   (f)  If applicable, the consumer's right to receive a credit on goods

or services received as a result of accepting the free offer when the
goods or services are returned or rejected, and the time period
during which the goods or services must be returned or rejected for
the purpose of receiving a credit[.]

ORS 646.644(2)(a)-(g).

43.    Pursuant to ORS 646.644(1)(c), "Clear and conspicuous information" means

"language that is readily understandable and presented in such size, color, contrast and location,

or audibility and cadence, compared to other language as to be readily noticed and understood,

and that is in close proximity to the request for consent to a free offer."

44.    Additionally, subsection (4) of the FOL further provides:

A person may not impose a financial obligation on a consumer as a
result of the consumer's acceptance of a free offer unless the
consumer's <u>affirmative consent</u> to the terms of the free offer as set
forth in subsection (2) of this section is obtained.

ORS 646.644(4) (emphasis added).

45.    Under ORS 646.644(1)(a), the FOL defines the term "Affirmative consent" as "a

consumer's agreement to incur a financial obligation as a result of accepting a free offer, or to

provide the consumer's billing information, given or made in the manner specifically identified

for the consumer to indicate the consumer's agreement."  ORS 646.644(1)(a).

46.    Subsection (5) of the FOL provides:

A person that makes a free offer to a consumer may not fail or
refuse to cancel the free offer if the consumer has used, or made
reasonable efforts to attempt to use, one of the procedures required
by subsection (2)(e) of this section.

ORS 646.644(5).

47.    Pursuant to subsection (6) of the FOL, "[a] person who violates a provision of this

section engages in an unlawful practice subject to enforcement and penalty under … 646.605

(Definitions for ORS 336.184 and 646.605 to 646.652)[.]"  ORS 646.644(6); see also ORS

646.608(1)(sss) ("(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (sss) Violates a provision of ORS 646.644 (Free offer).").

48.    As alleged below, Defendant's practices on the LinkedIn Platform systematically violate the FOL pursuant to ORS 646.644(2) and ORS 646.644(4).  Defendant's noncompliance with the FOL is a direct violation of UTPA.  See ORS 646.608(1)(sss).

**D.    Defendant's Business: The LP Subscription Enrollment Process**

49.    At all relevant times, Defendant offered, via the LinkedIn Website and App, various LP Subscriptions for access to exclusive "premium" LinkedIn content, products, and/or services on a contract or fee basis.  The LP Subscriptions are offered on a recurring basis for monthly and yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels.  For example, customers that sign up for a *monthly* LP Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel.  Similarly, customers enrolled in an *annual* LP Subscription are, at the end of the initial one-year period, automatically renewed and typically charged the full amount for the next year, and every year thereafter if they do not cancel.  Defendant's LP Subscriptions constitute "automatic renewal" and/or "continuous service" plans or arrangements as those terms are defined under ORS 646A.293(1) and ORS 646A.293(3).

50.    To sign up for one of Defendant's LP Subscriptions, the consumer must first select a program.  From a single webpage, prospective subscribers can review and compare the features of – and find links to the individual enrollment webpages for – each of Defendant's subscription offerings, including the LP Subscriptions at issue.

51.     Consumers can sign up for one of Defendant's LP Subscription plans through the LinkedIn Website or the LinkedIn App (collectively, the "LinkedIn Platform").  Customers who purchase an LP Subscription via the LinkedIn Platform are automatically enrolled by Defendant in their chosen LP Subscription program going forward, by default.  In addition, customers may sign up for any of the LP Subscriptions on a free-trial basis for a limited time.  Nevertheless, customers that enroll in a free trial, like those that sign up for a paid subscription, must provide Defendant their payment information at the time of enrollment.  Customers' free trial subscriptions automatically convert to paid monthly subscriptions at the end of the trial period, at which point those users are also automatically enrolled by Defendant in their chosen LP Subscription program, and as such their Payment Methods are automatically charged by Defendant on a recurring monthly or yearly basis in the amount of the full, promotional, or discounted rate associated with that program, continuing indefinitely until the customer takes affirmative steps to cancel.

52.     The enrollment process for each LP Subscription is substantially the same, regardless of the medium used.  For instance, after selecting one of the LP Subscriptions, those navigating the enrollment process on the LinkedIn Website are directed to a final webpage (the "Checkout Page"), where prospective subscribers are prompted to input their payment information and then invited to complete their purchase.  For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer," which in this case pertains to text nearby the final blue button that customers must press in order to complete the checkout process.

53.     By way of example, when a consumer signs up for a free trial of the LinkedIn

Premium Career Subscription, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text immediately above the "Start your free trial" button, *i.e.*, the "request for consent" (red markings added for emphasis):[70]



---

[70] The screen shot pictured is provided as an exemplar and was captured from the LinkedIn Website on November 11, 2020. The Checkout Page shown to consumers has remained substantially and materially unchanged between at least 2019 and the present, and, thus, the above image is representative of the disclosures and omissions shown both to Plaintiff in January 2019, and other Oregon subscribers that enrolled in an LP Subscription following Plaintiff's enrollment, including in November 2020, to and through the present.

54.    Regardless of how the consumer subscribes (via the LinkedIn Website, on either its desktop or mobile format, or the LinkedIn App(s)), and irrespective of which LP Subscription the subscriber selects (whether Premium Career, Premium Business, Sales Navigator, or Recruiter Lite), Defendant fails to disclose the full terms of its auto-renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for their LP Subscriptions.  Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

**E.    Defendant Violates Oregon's Automatic Renewal Law And Free Offer Law**

55.    At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of ORS 646A.295(1)(a); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of ORS 646A.295(1)(b); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of ORS 646A.295(1)(c). The Acknowledgment Email also fails to disclose a toll-free telephone number or describe another cost-effective, timely and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their LP

Subscriptions, in violation of ORS 646A.295(2).

56.    Additionally, as discussed below, with respect to members of the Oregon Class that initially enrolled in a free trial to any of the LP Subscriptions (as opposed to a straight-to-paid subscription), Defendant's missing, incomplete, inconspicuous, or otherwise inadequate pre-checkout disclosures also violate the FOL under ORS 646.644(2)(a), (b), (d), (e), (f), and (g).

i.    **Defendant Fails To Clearly And Conspicuously Present The LP Subscription Offer Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

57.    First, the relevant portion of the Checkout Page does not present the complete "offer terms[,]" as defined by ORS 646A.293(5), in violation of Section 646A.295(1)(a) of the ARL.  Specifically, using the pictured Checkout Page above as an example, Defendant fails to present a complete "description of the cancellation policy that applies to the offer," *see* ORS 646A.293(5)(b).  For instance, the relevant portion of the pictured Checkout Page merely states that "[t]o avoid charges for the next month, [the consumer must] cancel before the renewal date."[71]  However, this information is presented in basic, unbolded black type fact without any emphasis and it is placed immediately next to bolded text in the same sentence.  It is not presented in contrasting font or color to the surrounding text, and it is not set off from the surrounding text of the same size by any symbols or other marks in a manner that clearly calls attention to the language.  In other words, the disclosure was presented in such a way that it could be, and was, easily overlooked, and is therefore not "clear and conspicuous" as defined by ORS 646A.293(2).

---

[71] Additionally, as shown in the screen shot above, the Checkout Page also states, "You [the subscriber] can cancel anytime before" the end of the current billing cycle.  However, this statement does not appear in the block of text immediately above the "Start your free trial" button and therefore is not presented "in visual proximity ... to the request for consent to the offer."  ORS 646A.295(1)(a).

58.     Moreover, Defendant does not specify anywhere on the Checkout Page that customers must cancel their LP Subscriptions "at least one day before [their] next scheduled billing date" in order to "avoid getting charged for another billing cycle," as do terms set forth on other pages of Defendant's website.[72]  Additionally, the Checkout Page does not mention that subscribers "can only cancel [their] Premium subscription from the LinkedIn desktop site, mobile browser, or the LinkedIn mobile app, if [they] bought the Premium subscription via the LinkedIn desktop site[,]" as opposed to those who bought the LP Subscription through the LinkedIn App(s).[73]  Nor does it provide a toll-free phone number or any contact method that the consumer can use to reach out and affect cancellation, such as a toll-free phone number or an email address.  These undisclosed terms constitute material aspects of Defendant's cancellation policy.  However, Plaintiff was not previously aware of the above aspects of Defendant's cancellation policy as a result of the inadequate disclosures and/or outright omissions on the Checkout Page.  At no point during the life of her LP Subscription was Plaintiff required or even prompted to navigate to or otherwise examine any of the terms disclosed on the on any other page of the LinkedIn Platform aside from the Checkout Page.  Yet, prior to checkout, Defendant was obligated by law to place consumers on notice of these aspects of Defendant's cancellation policy in accordance with the ARL, which requires that companies provide such information "in visual proximity … to the request for consent to the [automatic renewal] offer."  ORS

---

[72] *See* LinkedIn Help, "Cancel LinkedIn Premium – FAQ" (last updated Jul. 11, 2022), *available at* https://www.linkedin.com/help/linkedin/answer/a551618 ("To avoid getting charged for another billing cycle, you need to cancel your plan at least one day before your next scheduled billing date.") (last accessed Jul. 26, 2022); *see also* LinkedIn Help, "Cancel LinkedIn Premium Subscription" (last updated Jul. 1, 2022), *available at* https://www.linkedin.com/help/linkedin/answer/a545578 ("To avoid getting charged for another billing cycle, you need to cancel your plan at least one day before your next scheduled billing date.  If you've missed cancelling your Premium trial and have been charged for your Premium Subscription, please refer to LinkedIn consumer refund policy.") (last accessed Jul. 26, 2022).

[73] "Cancel LinkedIn Premium Subscription," *supra*.

646A.295(1)(a).  It is not enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere on the LinkedIn Website; the ARL requires that Defendant present its full cancellation policy directly on the Checkout Page – and it must further do so clearly and conspicuously, *see* ORS 646A.293(2), and with the requisite proximity (*i.e.*, they must appear in the block of text immediately above the "Start your free trial" button on that page), *see* ORS 646A.295(1)(a) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase.  Accordingly, because the Checkout Page does not present a complete "description of the cancellation policy that applies to the offer[,]" *see* ORS 646A.293(5)(b), Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 646A.295(1)(a) of the ARL.

59.    For the same reasons, with respect to members of the Oregon Class that initially enrolled in a free trial to any of the LP Subscriptions (as opposed to a straight-to-paid subscription), Defendant's missing, incomplete, inconspicuous, or otherwise inadequate pre-checkout disclosures as described in the preceding paragraph also constitute violation of the FOL under ORS 646.644(2)(e), (f), and (g) in that Defendant failed to provide Plaintiff and other free trial subscribers with "clear and conspicuous information regarding … (e) … the consumer's right to cancel the free offer using procedures specifically identified for that purpose that, at a minimum, enable the consumer to cancel by calling a <u>toll-free telephone number</u> or to cancel in a manner substantially similar to that by which the consumer accepted the free offer; (f) [t]he <u>time period during which the consumer must cancel</u> in order to avoid incurring a financial obligation as a result of accepting the free offer; [and] (g) … the consumer's right to receive a credit on goods or services received as a result of accepting the free offer when the goods or services are returned or rejected, and the time period during which the goods or services must be returned or

rejected for the purpose of receiving a credit[.]"  ORS 646.644(2)(e)-(g) (emphasis added).

60.    The Checkout Page also fails to adequately disclose the length of the automatic renewal term associated with the LP Subscriptions, *see* ORS 646A.293(5)(d).  In particular, although the Checkout Page shown above states that consumer's LP Subscription "will automatically renew each month until cancelled[,]" based on that statement, the precise date of a given month or billing period that the consumer will be charged in connection with the LP Subscription is unclear.  For instance, it is not clear whether "month" refers to the precise calendar date of the consumer's initial enrollment, in which case the LP Subscription would renew every 28-31 days depending on the length of the given month, or refers to four-week intervals, in which case the LP Subscription would renew every 28 days without regard to the calendar date or exception.  Thus, the exact length of each renewal term is ambiguous in terms of start and end date from month-to-month or year-to-year.  And this information is also necessary for consumers to successfully affect cancellation because, as noted above, consumers must cancel "at least one day before [their] next scheduled billing date" in order to "avoid getting charged for another billing cycle," *see supra*.  Accordingly, a reasonable consumer would find that statement unclear in regards to the length of the applicable automatic renewal term, and, more specifically, when formal cancellation is required in order to stop Defendant from automatically charging renewal fees to customers' Payment Methods on a recurring basis.  If consumers are not on notice of the precise date that their LP Subscriptions will renew and their Payment Methods will be charged each month or billing period, they cannot, as a practical matter, affect cancellation before that date.  As such, Defendant fails to disclose "[t]he length of the automatic renewal term or that the service is continuous" in the manner required by the ARL.

ORS 646A.293(5)(c); ORS 646A.295(1)(a).[74]

61.    Additionally, the relevant portion of the Checkout Page for the LP Subscription does not adequately disclose that the subscription or purchasing agreement will continue until the consumer cancels or provide the recurring amount to be charged to the subscriber's Payment Method each billing period, *see* ORS 646A.293(5)(a), (c).  While such information may be provided in part or whole elsewhere on the Checkout Page, it does not appear in the block of text immediately above the "Start your free trial" button and is therefore not presented "in visual proximity … to the request for consent to the offer."  ORS 646A.295(1)(a).  Thus, as with the cancellation policy term, to the extent this information appears on the Checkout Page, the disclosure was presented in such a way that it could be, and was, easily overlooked, and is therefore not "clear and conspicuous" as defined by ORS 646A.293(2).  Given such inconspicuousness, Defendant fails to adequately disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels" in the manner required by statute, ORS 646A.293(5)(a), or that "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal or continuous service plan or arrangement, and, if the amount of the charge will change, the amount to which the charge will change, if known[,]" ORS 646A.293(5)(c), in violation of the ARL under ORS 646A.295(1)(a).[75]

---

[74] While additional information concerning the consumer's next billing date following expiration of the free trial may be provided elsewhere on the Checkout Page shown above, that information does not clarify the exact meaning of "every month" as used in the Checkout Page such that consumers are informed, as a general matter, as to the length of the applicable renewal cycle or are able to reliably calculate their precise billing date for subsequent months.  Additionally, to the extent this information does not appear in the block of text immediately above the "Start your free trial" button, it is not presented "in visual proximity ... to the request for consent to the offer."  ORS 646A.295(1)(a).

[75] Likewise, to the extent any other relevant language bearing on the offer terms applicable to the LP Subscriptions appears beneath the blue "Start your free trial" button (i.e., the "request for consent to the offer," ORS 646A.295(1)(a), also referred to herein as the "final checkout button") – which is not the portion of the Checkout Page with which the ARL is concerned, as reasonable consumers do not typically read past the final checkout button – such information cannot satisfy the ARL's requirement that Defendant clearly and conspicuously disclose the automatic renewal offer terms "in visual proximity … to the request for consent to the offer."  *Id*.

62.     For the same reasons, with respect to members of the Oregon Class that initially enrolled in a free trial to any of the LP Subscriptions (as opposed to a straight-to-paid subscription), Defendant's missing, incomplete, inconspicuous, or otherwise inadequate pre-checkout disclosures as described in the preceding paragraph also constitute violation of the FOL under ORS 646.644(2)(a) and (d) in that Defendant failed to provide Plaintiff and other free trial subscribers with "clear and conspicuous information regarding the terms of the free offer before the consumer agrees to accept the free offer, including … (a) [i]dentification of all … enrollments in a membership[ or] subscription … that the consumer will receive or incur a financial obligation for as a result of accepting the free offer; [and] (d) [a] statement[] … that by accepting the free offer, the consumer will become obligated for … enrollment in a membership[ or] subscription …, unless the consumer takes affirmative action to cancel the free offer or otherwise reject … the enrollment in a membership[or] subscription[.]"  ORS 646.644(2)(a), (d).

63.     Similarly, with respect to members of the Oregon Class that initially enrolled in a free trial to any of the LP Subscriptions (as opposed to a straight-to-paid subscription), Defendant's missing, incomplete, inconspicuous, or otherwise inadequate pre-checkout disclosures as described in the preceding paragraph also constitute violation of the FOL under ORS 646.644(2)(b) in that Defendant failed to provide Plaintiff and other free trial subscribers with "clear and conspicuous information regarding … [t]he cost to the consumer of any financial obligation the consumer will incur if the consumer accepts the free offer, including any fees or charges[.]"  ORS 646.644(2)(b).

64.     As a result of Defendant's missing and otherwise deficient pre-purchase disclosures, when Plaintiff selected and enrolled in her "free offer" for a trial LP Subscription,

she was unaware that Defendant had enrolled her in "automatic renewal" programs under which her subscription would renew each month and result in continuous monthly automatic renewal charges to her Payment Method unless and until she effectively canceled the subscription.

        **ii.**    **Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Offer Terms Associated With The LP Subscriptions.**

65.     Second, at no point during the checkout process does Defendant require consumers to read or affirmatively agree to any terms of service associated with its LP Subscriptions, *e.g.*, by requiring consumers to select or click a "checkbox" next to the automatic renewal offer terms to complete the checkout process.  Accordingly, when Defendant automatically renews customers' LP Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of ORS 646A.295(1)(b).

66.     For the same reason, with respect to members of the Oregon Class that initially enrolled in a free trial to any of the LP Subscriptions, Defendant's missing, incomplete, inconspicuous, or otherwise inadequate pre-checkout disclosures and its failure to obtain the requisite authorizations required by law and as described in the preceding paragraphs also constitute violations of the FOL under ORS 646.644(4) in that Defendant "impose[d] a financial obligation on [Plaintiff and other free trial subscribers in Oregon] as a result of the[ir] acceptance of a free offer [without first obtaining] the[ir] affirmative consent to the terms of the free offer as set forth in [ORS 646.644(2)]."  ORS 646.644(4).

        **iii.**   **Defendant Fails To Provide A Post-Checkout Acknowledgment That Clearly And Conspicuously Discloses The Required LP Subscription Offer Terms.**

67.     Finally, after Plaintiff and the members of the Class subscribed to one of

Defendant's LP Subscriptions, Defendant sent to Plaintiff and the Class email follow-ups regarding their purchases (the "Acknowledgement Email"). By way of example, the subject line of the Acknowledgment Email that Defendant sent to LinkedIn Premium subscribers as of March 2021 stated: "Your Linked Order [Number]." The body of the acknowledgment email contained, in relevant part, the following text and images:



68.      The Acknowledgment Email contains even less of the required information than is featured on the relevant portion of the Checkout Page, discussed above. Namely, the purchase confirmation does not clearly and conspicuously provide that the LP Subscription "will continue

until the consumer cancels" (ORS 646A.293(5)(a)), the recurring amount to be charged to the

subscriber's Payment Method each billing period (ORS 646A.293(5)(c)), or "[t]he length of the

automatic renewal term or that the service is continuous, unless the length of the term is chosen

by the consumer" (ORS 646A.293(5)(d)), and it fails entirely to provide any "description of the

cancellation policy that applies to the offer," ORS 646A.293(5)(b), or any explanation of how to

cancel the LP Subscriptions.  Any such disclosures of required automatic renewal offer terms are

either missing altogether or are deceptively incomplete, objectively inaccurate, and/or are

inconspicuously buried in the tiny, grey fine print at the bottom of the Acknowledgment Email

(*i.e.*, hidden in the fine print).  As such, the Acknowledgment Email fails to "include[] the

automatic renewal offer terms … and information regarding how to cancel in a manner that is

capable of being retained by the consumer[,]" in violation of the ARL under ORS

646A.295(1)(c).

     69.     Additionally, the Acknowledgment Emails fails to provide a toll-free telephone

number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation,

and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers

to cancel their LP Subscriptions, which further violates the ARL under ORS 646A.295(2).

            iv.    **Defendant Fails To Provide A Mechanism For Cancelling The LP Subscriptions That Is "Timely" Or "Easy-To-Use," And It Routinely Fails Or Refuses To Cancel Consumers' LP Subscriptions Notwithstanding Consumers' Reasonable Efforts To Cancel.**

     70.     Finally, the "mechanism for cancellation" of the LP Subscriptions is not one that

Plaintiff or reasonable consumers would consider "timely" or "easy-to-use" as the ARL requires.

*See* ORS 646A.295(2).  Indeed, online consumer complaints (*see, e.g.*, *supra*) indicate that

LinkedIn Premium subscribers have encountered a wide variety of cancellation issues during the

class period.  For instance, in October of 2020, hundreds of LinkedIn Premium subscribers

reported problems they encountered in trying to cancel their LP Subscriptions, noting that "the button to cancel subscriptions was removed from the Premium Subscription page, and the link to access payment methods was removed from the Settings page, preventing him from removing his credit card."[76] "The issue []meant that users were billed for an extra term – or more – if they did not successfully cancel their subscriptions or were unaware that the cancellation did not go through, even if the 'Cancel Subscription' button was available."[77] Further, subscribers "also report receiving no confirmation about the status of their cancellation request, adding to the confusion."[78] As is discussed further above, Plaintiff, like these subscribers, tried but failed to affect cancellation in 2021 and 2022 after learning of the unexpected recurring charges she had incurred in connection with the LP Subscription—not once but <u>three</u> times. And while Defendant "has acknowledged"[79] these cancellation issues to the public, it nevertheless continues to deny refund requests to customers in Plaintiff's position. Thus, as a direct result of Defendant's non-compliant cancellation mechanism, Plaintiff and putative Class Members have incurred substantial financial injury.

71.    Additionally, as illustrated by Plaintiff's experiences attempting to cancel (described in detail below, *see infra*), Defendant routinely fails or refuses to cancel consumers'

---

[76] *See* ZD Net, *Microsoft is working to fix LinkedIn Premium subscription cancellation problems* (Oct. 14, 2020), https://www.zdnet.com/article/microsoft-is-working-to-fix-linkedin-premium-subscription-cancellation-problems/ ("Users began experiencing this problem more than a week ago and reported it via the LinkedIn Help Forum but didn't hear back from LinkedIn until a day ago[.] … There are nearly 140 messages in the LinkedIn Help forum from users encountering similar problems trying to cancel their premium subscriptions.").

[77] Neowin, *Microsoft working to fix LinkedIn bug preventing users from canceling subscriptions* (Oct. 14, 2020), https://www.neowin.net/news/microsoft-working-to-fix-linkedin-bug-preventing-users-from-canceling-subscriptions/.

[78] *Id.*

[79] *Id.* ("Microsoft has acknowledged a bug in LinkedIn that prevents users from easily canceling their subscriptions. … In addition to fixing this bug, the company also noted that it is making more changes to better inform Premium subscribers of changes to plans or billing cycles. The firm will also be introducing reminder emails to notify users of upcoming renewals or when they approach the end of free trials.").

LP Subscriptions – and thus continues to charge fees to consumers' Payment Method – even after they have "used, or made reasonable efforts to attempt to use, one of the procedures required by subsection (2)(c) of th[e FOL,]" in violation of the FOL under ORS 646.644(5).

\* \* \*

72.    In sum, Defendant's pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL.  Specifically, the Checkout Page and Acknowledgment Email for the LP Subscriptions do not adequately describe the complete cancellation policy associated with a consumer's given LP Subscription, the recurring price to be charged in connection with the LP Subscriptions or that the initial amount may change during the course of a subscription agreement (and the amount to which it will change and when), or the precise length of the automatic renewal term applicable to the LP Subscriptions.  In addition, the Acknowledgment Email further fails to clearly and conspicuously disclose the continuous nature of the subscription or purchasing agreement.  Thus, the Checkout Page and Acknowledgment Email do not adequately disclose the associated "Offer term[s]" as defined by Section 646A.293(5) of the ARL, in violation of Section 646A.295(1)(c) of the ARL.  Disclosures of required offer terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in text outside of the area that is in "visual proximity … to the request for consent" on the Checkout Page or in the fine print at the bottom of the Acknowledgment Email.  In other words, to the extent any of the required information does, in fact, appear on the Checkout Page and/or Acknowledgment Email, such disclosures are presented in such a way that they could be, and – at least by Plaintiff – were, easily overlooked.  Such disclosures are therefore not "clear and conspicuous" as defined by ORS 646A.293(2).  Further, as noted above, Plaintiff struggled to cancel her LP Subscriptions due to Defendant's obscure, confusing, and time-consuming cancellation policy, the terms related to which were

either entirely missing or obscured from the Checkout Page and Acknowledgment Email.

73.    By and through these actions, Defendant has charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL under ORS 646A.295(1)(a), (1)(b), (1)(c), and (2).  As a result, pursuant to ORS 646A.295(5), all goods, wares, merchandise, and/or products sent to Plaintiff and the Class in violation of the statute are deemed to be "unconditional gift[s] to the consumer who may use or dispose of them in any manner the consumer sees fit without[.]"  ORS 646A.295(5).

74.    Additionally, with respect to members of the Class that initially enrolled in a free trial to any of the LP Subscriptions (including Plaintiff), Defendant's inadequate pre-purchase disclosures and failure to obtain affirmative consent before converting consumers' free trials to paid LP Subscriptions and charging their Payment Methods on a recurring basis fail to comply with the FOL, which provides that "[a] person who violates a provision of this section engages in an unlawful practice subject to enforcement and penalty under … 646.605 (Definitions for ORS 336.184 and 646.605 to 646.652)[.]"  ORS 646.644(6).  Specifically, Defendant's conduct violates the FOL pursuant to: ORS 646.644(2)(a)-(g), based on Defendant's failure to provide requisite pre-purchase disclosures before charging consumers' payment methods; ORS 646.644(4), based on Defendant's failure to obtain affirmative consent before charging consumers' payment methods; and ORS 646.644(5), based on Defendant's failure or refusal to cancel the free trial when the consumer has used, or made reasonable efforts to attempt to use, one of the required cancellation procedures.

75.    Because Defendant failed to disclose this material information in the manner required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent to Defendant's offer or knowingly enter into to the purchase agreements.  Thus, as a

direct result of Defendant's missing, incomplete, and otherwise deficient disclosures on the

Checkout Page and in the Acknowledgment Email, Plaintiff was induced to sign up for, unable

to terminate, and automatically charged for her LP Subscription.

76.    Accordingly, Plaintiff brings this action individually and on behalf of similarly

situated individuals against Defendant for violations of Oregon's Unlawful Trade Practices Act

("UTPA"), ORS 646.608.  As set forth in detail below, Plaintiff's UTPA claims – which are

based on, *inter alia*, Defendant's failure to adequately provide the requisite disclosures and

authorizations required to be made to Oregon consumers under the ARL pursuant to ORS

646A.295 and the FOL pursuant to ORS 646.644 – arise under ORS 646.608(1)(ttt) and and

ORS 646.608(1)(sss), respectively.[80]

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

77.    Plaintiff Julie Easterbrook is an individual consumer who signed up for a

LinkedIn Premium Career subscription on a free trial basis from Defendant's website while in

Oregon in or around January 2019.  At the time Ms. Easterbrook signed up for her free trial LP

Subscription, she provided her PayPal billing information (her "Payment Method") directly to

Defendant.

78.    Before Ms. Easterbrook purchased her free trial LP Subscription, Defendant did

not disclose to Ms. Easterbrook all required automatic renewal offer terms associated with the

subscription program.  Additionally, although the Checkout Page from which Ms. Easterbrook

made her purchase included some relevant information regarding automatic renewal, the manner

in which this information was presented was insufficient to put Ms. Easterbrook on notice of the

---

[80] As noted above, Ms. Easterbrook suffered a new and independently actionable economic injury on each of the thirty-eight occasions she incurred unauthorized fees in connection with her LP Subscription as a direct result of Defendant's conduct in the violation the ARL and FOL.

material "offer terms" associated with her LP Subscription, which, pursuant to ORS 646A.295(1)(a), Defendant was required to clearly and conspicuously disclose on the Checkout Page prior to Ms. Easterbrook's completion of her initial order for her LP Subscription. Specifically, prior to completing her initial LP Subscription order, the relevant screens and buttons presented to Ms. Easterbrook did not clearly and conspicuously state, *inter alia*, that her LP Subscription would automatically convert to a paid subscription and renew every month resulting in continuous automatic monthly charges to her Payment Method until she cancelled; they did not state the recurring charges that would be charged to Ms. Easterbrook's Payment Method as part of the automatic renewal plan; and they did not describe the full cancellation policy that applied to her purchase.

79.      Moreover, at no point prior to completing her initial purchase did Defendant obtain Ms. Easterbrook's affirmative consent to an agreement containing the automatic renewal offer terms associated with her LP Subscription.

80.      After Ms. Easterbrook completed her initial order, Defendant sent Ms. Easterbrook an Acknowledgment Email confirming that her free trial LP Subscription had been activated.  However, as discussed above, that Acknowledgment Email failed to provide Ms. Easterbrook with the complete automatic renewal terms that applied to Defendant's offer for LinkedIn Premium (including the mere fact that the LP Subscription would automatically convert from a free trial to a paid subscription and renew every month, resulting in continuous monthly charges to her Payment Method, unless and until Ms. Easterbrook chose to cancel), a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Easterbrook LP Subscription in a manner capable of being retained by her.  Ms. Easterbrook did not receive any other acknowledgments that contain the required information.

## **Defendant's Undisclosed Billing Practices**

81.     As a result of Defendant's missing and otherwise deficient disclosures, when Ms.

Easterbrook selected and enrolled in her LinkedIn Premium free trial subscription, she was

unaware that Defendant had enrolled her in an "automatic renewal" program under which her

subscription would renew each month and result in continuous monthly automatic renewal

charges to her Payment Method unless and until Ms. Easterbrook canceled the subscription.  Ms.

Easterbrook remained unaware of the unauthorized charges until approximately January or

February of 2021, when Defendant's conduct was first brought to her attention upon review (for

an unrelated purpose) of the recent transaction history associated with her Payment Method.

This review, in turn, caused Ms. Easterbrook to learn of the subscription charges she had

incurred since signing up for her free trial in January 2019, which indicated to Ms. Easterbrook

for the first time that she had enrolled been in a paid LP Subscription in the first place.  Prior to

that point, Ms. Easterbrook was not aware that she would be charged any money in connection

with her free trial, and she certainly did not understand that her free trial LP Subscription, in fact,

was or would automatically become an "automatic renewal" for which she would incur recurring

charges on an ongoing, monthly basis.  In other words, prior to January or February of 2021, Ms.

Easterbrook did not believe or suspect, and had no reason to believe or suspect, that Defendant

was acting in violation of the law by posting recurring fees to her Payment Method without first

providing and obtaining the requisite disclosures and authorizations required by Oregon's ARL

and FOL.

82.     Nevertheless, on or around February 25, 2019, approximately one month after

Ms. Easterbrook first signed up for her free trial LP Subscription, Defendant automatically

renewed Ms. Easterbrook's free trial LP Subscription to a paid LP Subscription and charged Ms.

Easterbrook's Payment Method in the amount of $29.99, the full monthly standard rate then associated with the paid monthly LP Subscription, without her knowing or affirmative consent. Thereafter, Defendant continued to automatically renew Ms. Easterbrook's LP Subscription on a monthly basis, charging her Payment Method an additional thirty-seven times, for a total of thirty-eight unauthorized charges to Ms. Easterbrook's Payment Method, with the most recent charge occurring on or around March 29, 2022.

83.    As shown by the table below, during the life of Ms. Easterbrook's LP Subscriptions, Defendant posted a total of thirty-eight unauthorized charges to Ms. Easterbrook's Payment Method amounting to $1,139.62 (including eight unauthorized charges amounting to $239.92 within the last twelve months alone):

| Billing Date | Amount |
|--------------|--------|
| 1/25/2019 | $0.00 (free trial period) |
| 2/25/2019 | $29.99 |
| 3/25/2019 | $29.99 |
| 4/25/2019 | $29.99 |
| 5/25/2019 | $29.99 |
| 6/25/2019 | $29.99 |
| 7/25/2019 | $29.99 |
| 8/25/2019 | $29.99 |
| 9/25/2019 | $29.99 |
| 10/25/2019 | $29.99 |
| 11/25/2019 | $29.99 |
| 12/25/2019 | $29.99 |
| 1/25/2020 | $29.99 |
| 2/25/2020 | $29.99 |
| 3/25/2020 | $29.99 |

| | |
|---|---|
| 4/25/2020 | $29.99 |
| 5/25/2020 | $29.99 |
| 6/25/2020 | $29.99 |
| 8/3/2020 | $29.99 |
| 8/25/2020 | $29.99 |
| 9/25/2020 | $29.99 |
| 10/25/2020 | $29.99 |
| 11/25/2020 | $29.99 |
| 12/25/2020 | $29.99 |
| 1/25/2021 | $29.99 |
| 2/25/2021 | $29.99 |
| 3/25/2021 | $29.99 |
| 4/25/2021 | $29.99 |
| 5/25/2021 | $29.99 |
| 6/25/2021 | $29.99 |
| 7/25/2021 | $29.99 |
| 8/25/2021 | $29.99 |
| 9/25/2021 | $29.99 |
| 10/25/2021 | $29.99 |
| 11/25/2021 | $29.99 |
| 12/25/2021 | $29.99 |
| 1/25/2022 | $29.99 |
| 2/25/2022 | $29.99 |
| 3/29/2022 | $29.99 |
| | **Total: $1,139.62** |

84.     The monthly fees that Defendant charged to Ms. Easterbrook's Payment Method in connection with her LinkedIn Premium subscription came as a surprise to Ms. Easterbrook

because, up until January or February of 2021, she had believed that the free trial membership in

which she enrolled in January of 2019 would automatically terminate following the initial trial

period. She was also unsure of how long her free trial would last, or when, if ever, the first

charge would occur following the conclusion of her free trial. She generally believed that

Defendant would inform her following the expiration of the free trial period and, at that point,

attempt to obtain her affirmative consent to begin charging monthly fees to Ms. Easterbrook's

Payment Method in connection with LinkedIn Premium if she wished to continue accessing the

benefits associated with the paid subscription at the full standard renewal rate associated with her

LP Subscription. As a result, Ms. Easterbrook did not expect to incur any charges in connection

with the LP Subscription prior to her discovery of these charges early 2021.

85.    Because Ms. Easterbrook was reasonably not expecting her free trial to LinkedIn

Premium to automatically convert to a paid LP Subscription and result in charges to her Payment

Method (either at all or on a recurring, monthly basis) before January or February 2021, the

thought of cancelling her free trial prior to that point did not occur to Ms. Easterbrook. That is,

believing the membership plan would automatically terminate following the initial trial period

and there was therefore no need to affect cancellation in order to avoid future charges, Ms.

Easterbrook did not attempt to cancel her LP Subscription before having already incurred several

unauthorized charges in connection with the LP Subscription. Ms. Easterbrook was also

unaware of the recurring price that would be charged in connection with LinkedIn Premium until

her discovery of the monthly charges Defendant had posted to Ms. Easterbrook's Payment

Method in early 2021—well after the free trial had already ended and the automatic charges had

already begun. Thus, by that point, significantly damage had already been done: by January

2021, Defendant had already posted over $700 of unauthorized fees to Ms. Easterbrook's

Payment Method.  As explained below, promptly upon learning of the unauthorized charges, Ms. Easterbrook promptly attempted to cancel her LP Subscription in order to avoid incurring any additional future charges.  However, notwithstanding Ms. Easterbrook's diligent efforts, Defendant continued to charge Ms. Easterbrook's Payment Method for the subsequent months, resulting in another $400 or so unauthorized charges to Ms. Easterbrook's Payment Method.

86.    Ms. Easterbrook's confusion and surprise with respect to the monthly renewal fees she incurred following enrollment in her free trial in January 2019 – and, in particular, about the offer terms applicable to the LP Subscriptions concerning automatic renewal, price, billing date, and cancellation – is the direct result of Defendant's failure to place Ms. Easterbrook on notice of several material offer terms associated with her LP Subscription.  In particular, Ms. Easterbrook was not made aware of the fact that Defendant had enrolled her in an "automatic renewal" program under which her LP Subscription would automatically renew each month after the initial trial period and result in continuous charges to her Payment Method unless and until Ms. Easterbrook successfully cancelled the membership before the trial period ended, or prior to any subsequent billing period.  Nor was Ms. Easterbrook made aware of Defendant's cancellation policy, the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email, and Defendant also failed to adequately disclose the length of the free trial period and the precise recurring amount that would be charged to Ms. Easterbrook's Payment Method as part of her LP Subscription.  These omissions constitute violations of the ARL pursuant to ORS 646A.295(1)(a) and (1)(b), *see also* ORS 646A.293(5)(a)-(d), as well as violations of the FOL pursuant to ORS 646.644(2) and (4).

87.    And, to the extent any of the required information was presented on the Checkout Page or in the Acknowledgment Email, such disclosures were either incomplete, ambiguous,

inconspicuous buried in the fine print on both the Checkout Page and the Acknowledgment Email as noted above (*see supra*), and/or were otherwise incomplete, ambiguous, obscured, and/or lacking in the requisite visual proximity.  Therefore, any such term was presented in such a way that the term could be – and, by Plaintiff, was – easily overlooked, and is therefore not "clear and conspicuous" as defined by the ARL pursuant to ORS 646A.293(2), in violation of ORS 646A.295(1)(a)-(b), or as that term is defined by the FOL pursuant to ORS 646.644(1)(c), in violation of ORS 646.644(2), (4).

88.    In sum, because Ms. Easterbrook did not expect that her free trial would automatically convert into a paid LP Subscription in the first place, Ms. Easterbrook was unaware at the time she initially signed up for a free trial in January 2019 that she would incur *any* renewal charges whatsoever in connection with LinkedIn Premium, and she remained unaware of the automatic renewal feature associated with Defendant's free trial offer until approximately January or February of 2021, when, upon review of the transactional history associated with her Payment Method, Ms. Easterbrook learned that her free trial had in fact been automatically converted to a paid LP Subscription and that she had been charged renewal fees by Defendant every month since her free trial expired in 2019 in connection with the same, giving her reason to believe that those fees would continue thereafter on a monthly basis.  Prior to discovering these charges in or around January or February of 2021, Ms. Easterbrook did not expect that, once the free trial ended, Defendant would automatically post subscription fees to her Payment Method on a monthly basis without further confirmation on her part.

\* \* \*

### Defendant's Undisclosed, Time-Consuming, And Confusing Cancellation Policy

89.    Promptly upon learning in or around January or February of 2021of the unauthorized charges Defendant had posted to her Payment Method, Ms. Easterbrook attempted

to cancel her LP Subscription in order to avoid incurring any additional future charges in connection with LinkedIn Premium.  In fact, Ms. Easterbrook attempted to cancel on at least three different occasions, with the first attempt occurring in or around January or February of 2021, within days (if not on the same day) of first learning of the unauthorized subscription charges.  Ms. Easterbrook also attempted to cancel in or around May of 2021, and in or around late March or early April of 2022.  However, once Ms. Easterbrook learned that her LP Subscription did, in fact, automatically renew and would continue to do so without her intervention, Ms. Easterbrook had no idea how to cancel her LP Subscription and did not expect that it would be as difficult and confusing a process as it turned out to be.  As a result, all but the last of Ms. Easterbrook's three cancellation attempts were ultimately unsuccessful, and she was unable to terminate her subscription prior to March 2022 due to Defendant's confusing cancellation policy, the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email.

90.    As described above and below, neither the Checkout Page nor the Acknowledgment Email contain Defendant's full cancellation policy (among other omissions), and nor do they provide any explanation whatsoever regarding how to cancel the LP Subscription.  As a result, based on the pre- and post-check out disclosures featured on the Checkout Page and in the Acknowledgment Email, Ms. Easterbrook did not know anything about how to cancel her LP Subscription or of the associated refund policy with respect to cancellations or any other limitations or consequences, as are set forth on other pages of Defendant's website.

91.    Indeed, Ms. Easterbrook struggled to cancel her LP Subscription due to Defendant's obscure, confusing, and time-consuming cancellation policy, the terms related to

which were entirely missing from the Checkout Page and Acknowledgment Email. For instance, Ms. Easterbrook an excessive amount of time searching through the LinkedIn Website for a cancellation button or other similar online mechanism for cancellation, after which she felt "defeated." Thus, Ms. Easterbrook "made reasonable efforts to attempt to use[] one of the procedures required by subsection (2)(e) of [the FOL,]" ORS 646.644(5) – namely, she attempted "to cancel in a manner substantially similar to that by which [Ms. Easterbrook] accepted the free offer" (*i.e.*, through the click of a button available on the LinkedIn Website), ORS 646.644(2)(e). However, at least on the first two occasions she attempted to cancel, she was unable to find any such mechanism for cancellation through the LinkedIn Website. As a result, Ms. Easterbrook's first two attempts at cancellation were utterly ineffective, and following both attempts Defendant continued to charge fees to her Payment Method for the subsequent months despite its failure to comply with the pre-purchase requirements of Oregon law with respect to the pre-purchase Checkout Page, in violation of the FOL under ORS 646.644(2)(e) ("A person may not make a free offer to a consumer, or impose a financial obligation on the consumer as a result of the consumer's acceptance of a free offer, unless the person provides the consumer with clear and conspicuous information regarding the terms of the free offer before the consumer agrees to accept the free offer, including at a minimum … the consumer's right to cancel the free offer … in a manner substantially similar to that by which the consumer accepted the free offer[.]") and ORS 646.644(5) ("A person that makes a free offer to a consumer may not fail or refuse to cancel the free offer if the consumer has used, or made reasonable efforts to attempt to use, one of the procedures required by subsection (2)(c)[.]").

92.    Moreover, Defendant's failure to specify anywhere on the pre-purchase Checkout Page (or, for that matter, the post-purchase Acknowledgment Email) that customers must cancel

their LP Subscriptions "at least one day before [their] next scheduled billing date" in order to "avoid getting charged for another billing cycle," as do terms set forth on other pages of Defendant's website (*see supra*) violates the FOL under ORS 646.644(2)(f) ("A person may not make a free offer to a consumer, or impose a financial obligation on the consumer as a result of the consumer's acceptance of a free offer, unless the person provides the consumer with clear and conspicuous information regarding the terms of the free offer before the consumer agrees to accept the free offer, including … [t]he time period during which the consumer must cancel in order to avoid incurring a financial obligation as a result of accepting the free offer[.]").

93.    Further, because the cancellation mechanisms that exist for the LP Subscriptions, including the exclusively online mechanism through which Ms. Easterbrook attempted to cancel and any associated limitations on cancellation as discussed above, are not sufficiently described in the Acknowledgment Email, Defendant violates the ARL under ORS 646A.295(1)(c).  The Acknowledgment Email is also silent as to any toll-free telephone number, electronic mail address, or post-office address available for cancellation.  And, given the amount of time and effort Ms. Easterbrook spent during the course of each of these cancellation attempts (including the first two failed attempts occurring in January or February of 2021 and May of 2021), the exclusively online cancellation mechanism that exists cannot be considered "timely" or "easy-to-use."  Thus, the Acknowledgment Email fails "provide a toll-free telephone number, electronic mail address, a post-office address only when the person directly bills the consumer, or another cost-effective, timely and easy-to-use mechanism for cancellation" or to "describe[ any such mechanism] in the acknowledgment," in violation of the ARL under ORS 646A.295(2).

94.    Ms. Easterbrook was not previously aware of the above aspects of Defendant's cancellation policy.  At no point during the life of her LP Subscription was Ms. Easterbrook

required or even prompted to navigate to or otherwise examine any of the terms disclosed on any other page of the LinkedIn Platform, aside from the Checkout Page. Defendant neglected to disclose this information to Ms. Easterbrook either at the point of purchase on the Checkout Page or later in the Acknowledgment Email that Defendant sent to Ms. Easterbrook after she completed the checkout process.

* * *

95.     In sum, Defendant failed to place Ms. Easterbrook on notice of its cancellation policy or provide Ms. Easterbrook information regarding how to cancel in a manner that is capable of being retained by her, in violation of the ARL pursuant to ORS 646A.295(1)(a) and (1)(c) and in violation of the FOL pursuant to ORS 646.644(2)(e)-(g) and (5).

96.     Defendant's pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL, which deems products provided in violation of the statute to be "an unconditional gift to the consumer who may use or dispose of them in any manner the consumer sees fit without[.]" ORS 646A.295(5).

97.     Additionally, with respect to members of the Class that initially enrolled in a free trial to any of the LP Subscriptions (including Plaintiff), Defendant's pre-purchase disclosures and lack of affirmative consent fail to comply with the FOL, which provides that "[a] person who violates a provision of this section engages in an unlawful practice subject to enforcement and penalty under … 646.605 (Definitions for ORS 336.184 and 646.605 to 646.652)[.]" ORS 646.644(6).

98.     Each and every monthly charge posted to Ms. Easterbrook's Payment Method from the time of her enrollment in the free trial LP Subscription in January 2019 through March 2022 – during which period she incurred a total of thirty-eight unauthorized charges – amounts to a distinct economic injury as a result of Defendant's continued and further unlawful conduct.

Page 67 – FIRST AMENDED COMPLAINT

Therefore, each recurring charge Ms. Easterbrook incurred gives rise to an independently

actionable claim under the UTPA based on Defendant's repeated unlawful practice of charging

consumers' Payment Methods without first providing and obtaining the requisite disclosures and

authorizations, in violation of the ARL and FOL.

99.    As a direct result of Defendant's unlawful conduct described above, Plaintiff

suffered ascertainable loss in the form of economic injury equal to all monies withdrawn from

Plaintiff's Payment Methods in connection with the LP Subscriptions without first fully and

adequately disclosing the offer terms associated with the subscription or purchasing agreement

and obtaining their affirmative consent to those terms.  That is because Defendant "failed to

disclose the legally required information and assessed a . . . fee in violation of the UTPA."

*Scharfstein v. BP W. Coast Prod., LLC*, 292 Or. App. 69, 90 (2018).  "In doing so, [Defendant]

illegally charged [Plaintiff and its other Oregon] customers [recurring subscription fees], thereby

causing the ascertainable loss."  *Id.*; *see also id.* at 89 ("In an illegal charge case such as this one,

whether a customer relied on the nondisclosure of a fee does not matter; what matters is whether

the fee is disclosed in the particular way that the law requires. The UTPA prohibits businesses

from charging customers other types of fees when they are not disclosed in the particular way

that the law requires. … If any of those businesses were to violate any of the terms under which

they may assess those fees, the assessment would result in an illegal charge. The customer's

actual awareness or knowledge of the illegality would be irrelevant.").[81]

---

[81] *See also Miller v. WinCo Foods, LLC*, 2020 WL 6693149, at *7 (D. Or. Sept. 3, 2020), *report and recommendation adopted*, 2020 WL 6685697 (D. Or. Nov. 12, 2020) ("[Defendant] was required to accurately advertise the price it intended to charge Plaintiffs for the non-grocery goods.  Plaintiffs effectively assert that once WinCo made the decision to recoup the Surcharge from the customer, its failure to include the Surcharge in the advertised price of the items was a violation of the Act and, consequently, its collection of the Surcharge was improper, or 'illegal.'  The court finds, viewing the allegations of the Complaint in a light most favorable to Plaintiffs, Plaintiffs adequately allege an ascertainable loss under the 'illegal charge' theory."); *Stewart v. Albertson's, Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Russell v. Ray Klein, Inc.*, 2019

100.    In the alternative, Defendant's ARL violations caused Plaintiff ascertainable loss in the form of financial injury because Plaintiff reasonably relied on Defendant's conspicuous disclosures of the Checkout Page and the Acknowledgment Email – and, as a natural corollary, on the omissions and/or the inconspicuousness of the disclosures contained therein – in deciding whether to purchase her LP Subscription in the first place and whether to continue paying for them after that (*i.e.*, by not cancelling the auto-renewal prior to incurring renewal charges for the subsequent billing period).  Had Defendant complied with the ARL by adequately disclosing – and obtaining Plaintiff's affirmative consent to – the requisite LP Subscription offer terms on the Checkout Page at the point of Plaintiff's initial purchases, Plaintiff would have been able to read and review the auto renewal terms prior to purchase and would not have enrolled in LP's paid automatic renewal programs in the first place, or she would have subscribed to the LP Subscription on materially different terms, thereby avoiding financial injury of any kind as a result of Defendant's ARL violations.  Similarly, had Defendant complied with the ARL by adequately disclosing the terms associated with Plaintiff's LP Subscription in the post-checkout Acknowledgment Email (*i.e.*, after initial enrollment in her LP Subscription, but before any subsequent automatic renewal charge of Plaintiff's Payment Methods in connection with same),

---

WL 6137455, at *4 (D. Or. Nov. 19, 2019) ("Defendants final argument is that even if they are subject to and violated the UTPA, [plaintiff's] claim still fails because he never suffered an ascertainable loss of money or property because of the alleged violations. … Defendants['] argu[ment] … misses the mark. Here, Mr. Russell's loss is the improper collection of the $45 fee. [Thus, plaintiff] and putative class members suffered an ascertainable loss of money in the form of the unlawful fees collected from them by defendants, which they otherwise would not have had to pay if defendants had not engaged in conduct violating the UTPA.") (internal citations and quotation marks omitted); *Tri-W. Const. Co. v. Hernandez*, 43 Or. App. 961, 972 (1979) ("[P]roof that a party justifiably relied on a representation is not necessary when the representation involves a matter about which the party making it is legally required to inform the other."); *Sanders v. Francis*, 277 Or. 593, 598-99 (1977) ("Defendants' chief argument[] … is that irrespective of any unlawful practice committed by defendants, plaintiff must have acted in reliance on that practice in order to have a civil action under ORS 646.638. … But an examination of the possible forms of unlawful practices shows that this cannot invariably be the case. Especially when the representation takes the form of a 'failure to disclose' … , as in this case, it would be artificial to require a pleading that plaintiff had 'relied' on that non-disclosure. …Whether ORS 646.638(1) requires reliance as an element of causation necessarily depends on the particular unlawful practice alleged. … We hold that the demurrer should have been overruled.  Reversed and remanded."); *see also Rollins v. Wink Labs, Inc.*, 2021 WL 1976082, at *5-6 (D. Or. Feb. 22, 2021).

Page 69 – FIRST AMENDED COMPLAINT

Plaintiff would have been able to read and review the applicable offer terms prior to further automatic renewal(s) for the subsequent billing period(s), and she would have successfully cancelled her LP Subscription prior to the expiration of the subscription period in which she learned such information, thereby avoiding all or part of the aggregate automatic renewal charges Plaintiff incurred in connection with her LP Subscriptions following initial enrollment. But Defendant did not adequately disclose the required automatic renewal and free offer terms in either the Checkout Page or the Acknowledgment Email, thereby depriving Plaintiff of the opportunity to make informed decisions as to the recurring transactions, in violation of the ARL.

101.    Defendant is – and, at all relevant times, has been – well aware that its LP Subscription fails to comply with Oregon's ARL and, with respect to its free trial offers, the substantially similar requirements of the FOL. Indeed, Defendant was already sued in a substantially similar putative class action lawsuit pursuant to California's Automatic Renewal Law, Cal. Bus. & Prof. Code §§ 17600, *et seq*. *See Mendez v. LinkedIn Corporation*, No. 21CV378575 (Cal. Super. Court) (the "*Mendez* Action"), which was filed in March 2021 in the Superior Court of Santa Clara. Notably, the California Automatic Renewal Law was enacted in 2010, one year prior to the enactment of Oregon's ARL in 2011, and it features identical language as Oregon's ARL with respect to legislative intent. *Compare* ORS 646A.292 *with* Cal. Bus. & Prof. Code § 17600 (statement of legislative intent). Additionally, Oregon's five-part statutory definition of "offer terms" under ORS 646A.293(5)(a)-(e) mirrors California's definition of "Automatic renewal offer terms" under Cal. Bus. & Prof. Code § 17601(b)(1)-(5). *Compare also* ORS 646A.293(2) *with* Cal. Bus. & Prof. Code § 17601(c) (definition of "clear and conspicuous"). And, most importantly, the requirements and prohibitions of the operative provisions of Oregon's ARL are substantively the same as the California version. *Compare* ORS

646A.295(1)(a)-(c) *with* Cal. Bus. & Prof. Code § 17602(a)(1)-(3). *Compare also* ORS 646A.295(2) *with* Cal. Bus. & Prof. Code § 17602(b) (requiring a "cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment"); *compare* ORS 646A.295(5) *with* Cal. Bus. & Prof. Code § 17603 (unconditional gift provision). Thus, by virtue of, among other things, the earlier enactment of California's substantially identical ARL, the *Mendez* Action asserting violations of California's ARL, and the large volume of online consumer complaints discussed above regarding Defendant's billing practices with respect to the LP Subscriptions, Defendant knew or should have known that its conduct constitutes violations of the ARL, as well as the FOL (and, thus, the UTPA).

102.    The facts giving rise to Plaintiff's claims are materially the same as the Class she seeks to represent.

## CLASS ACTION ALLEGATIONS

103.    **Class Definition**: Plaintiff brings this action individually and on behalf of a class of similarly situated individuals as a class action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure. The classes Plaintiff seeks to represent are defined as follows (collectively, the "Classes"):

(a)    ***Oregon Class.*** All persons in Oregon who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred fee(s) in connection with Defendant's LP Subscription offerings (the "Oregon Class").

(b)    ***Oregon Subclass.*** All members of the Oregon Class who, within the applicable statute of limitations periods, up to and including the date of final judgment in this action, incurred fee(s) in connection with their enrollment in a free trial to any of Defendant's LP Subscription offerings (the "Oregon Subclass").

(c) ***Nationwide Class***. All persons in the United States who, within the applicable statute of limitations periods, up to and including the date of final judgment in this action, incurred fee(s) in connection with Defendant's LP Subscription offerings (the "Nationwide Class").

104. Specifically excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

105. Plaintiff reserves the right to amend the definitions of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

106. ***Numerosity.*** Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, the Oregon Class and Subclass each comprise at least hundreds of thousands or millions of consumers throughout Oregon, and the Nationwide Class comprises at least millions of consumers throughout United States. The precise number of members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

107. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual members of the Classes and Subclass. Common legal and factual questions include, but are not limited to: (i) whether Defendant's LP Subscriptions constitute "Automatic renewal[s]" and/or "Continuous service[s]" within the meaning of ORS 646A.293(1) and (4); (ii) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual

proximity to the request for consent to the offer, in violation of ORS 646A.295(1)(a); (iii) whether Defendant charged Plaintiff's and Oregon Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of ORS 646A.295(1)(b); (iv) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Oregon Class, in violation of ORS 646A.295(1)(c); (v) whether the goods and services provided by Defendant to consumers pursuant to the LP Subscriptions are deemed "unconditional gifts" in accordance with ORS 646A.295(5); (vi) whether Defendant's failure to comply with the Oregon ARL as alleged herein violated the UTPA's prohibitions of engaging in unlawful practices in the course of its business, vocation, or occupation under ORS 646.608(1)(ttt); (vii) whether Defendant's conduct was proscribed by the FOL pursuant to ORS 646.644(2), which prohibits a person from "mak[ing] a free offer to a consumer, or impos[ing] a financial obligation on the consumer as a result of the consumer's acceptance of a free offer, unless the person provides the consumer with clear and conspicuous information regarding the terms of the free offer before the consumer agrees to accept the free offer"; (viii) whether Defendant's conduct was proscribed by the FOL pursuant to ORS 646.644(4), which provides that a "person may not impose a financial obligation on a consumer as a result of the consumer's acceptance of a free offer unless the consumer's affirmative consent to the terms of the free offer as set forth in subsection (2) of this section is obtained"; (ix) whether Defendant's failure to comply with the Oregon FOL as alleged herein violated the UTPA's prohibitions of engaging in unlawful practices in the course of its business, vocation, or occupation under ORS 646.608(1)(sss); (x) whether Defendant's use or employment

of the unlawful practice(s) alleged herein was willful and/or reckless or knowing; (xi) whether Plaintiff and members of the Oregon Class and Subclass suffered ascertainable loss of money or property as a result of Defendant's conduct; (xii) whether Plaintiff and members of the Oregon Class and Subclass are entitled to recover statutory damages of $200 per violation pursuant to ORS 646.638(1) and ORS 646.638(8); (xiii) whether Plaintiff and the Oregon Class and Subclass are entitled to recover punitive damages and/or equitable relief under ORS 646.638(1); (xiv) whether Plaintiff and the Oregon Class and Subclass are entitled to attorneys' fees and costs under ORS 646.638(3); (xv) whether Defendant's conduct alleged herein constitutes unjust enrichment; (xvi) whether Plaintiff and members of the Classes to restitution are entitled to restitution as a result of Defendant's allegedly unlawful conduct; and (xvii) whether Defendant should be enjoined from further engaging in the misconduct alleged herein.

108.    *Typicality.*  Plaintiff's claims are typical of the claims of the proposed Class and Subclass in that Plaintiff and members of the Classes sustained damages as a result of Defendant's uniform wrongful conduct, based upon, *inter alia*, Defendant's failure to obtain Plaintiff's and the Class and Subclass members' affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the LP Subscriptions before charging their Payment Methods in connection with LinkedIn Premium.

109.    *Adequacy*.  Plaintiff will fairly and adequately protect Class and Subclass members' interests.  Plaintiff has no interests antagonistic to Class and Subclass members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

110.    *Superiority*.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions

of individual actions are economically impractical for members of the Class and Subclass; the

Class and Subclass are readily definable; prosecution as a class action avoids repetitious

litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of

decisions; and prosecution as a class action permits claims to be handled in an orderly and

expeditious manner.

111.    Defendant has acted or failed to act on grounds generally applicable to the

Classes, thereby making appropriate final injunctive relief with respect to the proposed Classes

as wholes.

112.    Without a class action, Defendant will continue a course of action that will result

in further damages to Plaintiff and members of the Classes and Subclass and will likely retain the

benefits of Defendant's wrongdoing.

113.    Based on the foregoing allegations, Plaintiff's claims for relief include those set

forth below.

<u>COUNT I</u>
**Violations of Oregon's Unlawful Trade Practices Act ("UTPA"),**
**ORS §§ 646.608(1)(ttt)**
**(*On Behalf Of The Oregon Class*)**

114.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the

preceding paragraphs as though alleged in this Count.

115.    Plaintiff brings this claim individually and on behalf of the members of the

proposed Oregon Class against Defendant.

116.    The Oregon Unlawful Trade Practices Act ("UTPA"), which was enacted in 1971

and is codified at ORS 646.605-646.656, is remedial statutory scheme enacted as a

comprehensive statute for the protection of consumers from unlawful trade practices.  The UTPA

prohibits unlawful practices in the course of the person's business, vocation, or occupation with

respect to both general and specific conduct.  Specifically proscribed conduct is set forth under

Section 646.608(1), which has 79 subsections and many of which refer to other provisions of the

Oregon Revised Statutes.  *See* O.R.S. 646.608(1)(a)–(aaaa).

117.    The UTPA authorizes private civil actions.  Pursuant to Section 646.638(8)(a) of

the UTPA, "a person that suffers an ascertainable loss of money or property, real or personal, as

a result of another person's willful use or employment of a method, act or practice declared

unlawful under ORS 646.608 … may bring an individual action in an appropriate court to

recover actual damages or statutory damages of $200, whichever is greater."  ORS 646.638(1);

*see also* ORS 646.638(8).  In a class action, plaintiffs may recover statutory damages only if they

suffered an ascertainable loss "as a result of a reckless or knowing use or employment" of an

unlawful trade practice.  ORS 646.638(8)(a).

118.    Defendant is a "Person" as defined in ORS 646.605(4).

119.    The LP Subscriptions are goods as defined by ORS 646.605(6)(a), because the

constitute products that may be obtained primarily for personal, family, or household uses.

120.    "The UTPA prohibits businesses from charging customers other types of fees

when they are not disclosed in the particular way that the law requires."  *Stewart v. Albertson's,

Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Scharfstein v. BP West

Coast Products, LLC*, 292 Or. App. 69, 89, *review denied*, 363 Or. 815 (2018) (same); *see also

Miller v. WinCo Foods, LLC*, 2020 WL 6693149, at *7 (D. Or. Sept. 3, 2020), *report and

recommendation adopted*, 2020 WL 6685697 (D. Or. Nov. 12, 2020); *Russell v. Ray Klein, Inc.*,

2019 WL 6137455, at *4 (D. Or. Nov. 19, 2019); *Tri-W. Const. Co. v. Hernandez*, 43 Or. App.

961, 972 (1979); *Sanders v. Francis*, 277 Or. 593, 598-99 (1977); *Rollins v. Wink Labs, Inc.*,

2021 WL 1976082, at *5 (D. Or. Feb. 22, 2021).

121.    As explained below, at all relevant times, Defendant violated, and continues to violate, the UTPA's proscription against engaging in unlawful conduct by charging customers certain types of fees without first disclosing the required pre-purchase information and obtaining authorization in the particular way that the law requires.

122.    Specifically, Defendant's actions are "unlawful" within the meaning of the UTPA because they violated the Oregon's Automatic Renewal Law ("ARL"), ORS §§ 646A.292-646A.295, in direct violation of Section 646.608(1)(ttt) of the UTPA.  In particular, following consumers' (including Plaintiff's and Class members') initial enrollments in the LP Subscriptions, Defendant automatically charges subscription fees to consumers' Payment Methods notwithstanding Defendant's uniform and systematic failure to provide legally required information at the point of purchase.  As is explained in the above paragraphs of this complaint, which are incorporated herein by reference, by doing so, Defendant violated multiple provisions of Oregon's ARL.  *See supra* (alleging violations of specific provisions of ORS 646A.295).

123.    Defendant's noncompliance with the ARL is a direct violation of UTPA.  *See* ORS 646.608(1)(ttt) ("(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (ttt) Violates a provision of ORS 646A.295 (Prohibited actions).").

124.    Specifically, Defendant violated, and continues to violate, the ARL because, at all relevant times, it failed, and continues to fail, to:  (a) provide the auto-renewal terms associated with the LP Subscriptions in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity to the request for consent to the offer, in violation of ORS 646A.295(1)(a); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of ORS 646A.295(1)(b); and

(c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of ORS 646A.295(1)(c).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their LP Subscriptions, in violation of ORS 646A.295(2).

125.    Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the Section 646.608(1) of the UTPA.

126.    Defendant was prohibited from charging Plaintiff's and Class members' Payment Methods without first adequately disclosing to the consumer the automatic renewal offer terms associated with the LP Subscriptions and obtaining the consumer's affirmative consent to the agreement containing those terms.  *See* ORS 646A.295(1)(a)-(b) ("(1) It is unlawful for a person that makes an automatic renewal or continuous service offer to a consumer in this state to do any of the following:  (a) Fail to present the automatic renewal offer terms … in a clear and conspicuous manner before a subscription or purchasing agreement is fulfilled and in visual proximity … to the request for consent to the offer.  (b) Charge the consumer's [Payment Method] for an automatic renewal … without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms"); *see also* ORS 646A.295(4) ("The requirements of this section must be met prior to the completion of the initial order for the automatic renewal or continuous service[.]").  Nevertheless, Defendant failed to do either before repeatedly charging Plaintiff and Oregon Class members in connection with the LP Subscriptions, in violation of the Oregon ARL.

127.    Thus, Defendant "failed to disclose the legally required information and assessed a … fee in violation of the UTPA." *Scharfstein v. BP W. Coast Prod., LLC*, 292 Or. App. 69, 90

(2018).  "In doing so, [Defendant] illegally charged [their] customers [recurring subscription fees], thereby causing the ascertainable loss."  *Id.*; *see also Rollins v. Wink Labs, Inc.*, 2021 WL 1976082, at \*5 (D. Or. Feb. 22, 2021); *Stewart v. Albertson's, Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Solano v. Kroger Co.*, 2020 WL 7028473, at \*3–4 (D. Or. Nov. 30, 2020); *Miller v. WinCo Foods, LLC*, 2020 WL 6693149, at \*6–7 (D. Or. Sept. 3, 2020); *report and recommendation adopted*, 2020 WL 6685697 (D. Or. Nov. 12, 2020); *Russell v. Ray Klein, Inc.*, 2019 WL 6137455, at \*4 (D. Or. Nov. 19, 2019).

128.    Each and every charge posted to Plaintiff's and Class members' Payment Methods in connection with the LP Subscriptions during the relevant period amounts to a distinct economic injury and gives rise to an independently actionable claim under the UTPA based on Defendant's repeated unlawful practice of charging consumers' Payment Methods without first providing and obtaining the requisite disclosures and authorizations as required by the ARL.

129.    Moreover, pursuant to the ARL, all products received from Defendant in violation of the ARL constitute "unconditional gifts."  *See* ORS 646A.295(5).  In other words, once Defendant tendered, and Plaintiff and Class members were provided access to, the "goods, wares, merchandise or products" of the LP Subscriptions (*i.e.*, their benefits) vis-à-vis their activation, Plaintiff and Class members assumed title and ownership over such goods as their property, and when Plaintiff and Class members with the right to "use or dispose of them in any manner the consumer sees fit without any obligation to the person[.]"  *Id.*

130.    Thus, by ultimately revoking Plaintiff's and other similarly situated Class members' access to such goods once recurring payments were eventually stopped, Defendant wrongfully deprived Plaintiff and Oregon Class members of their property.

131.    Thus, Plaintiff has sustained an ascertainable loss of money *and* property as a

result of Defendant's use or employment of methods, acts, or practices declared unlawful by ORS 646.608(ttt) (*i.e.*, Defendant's conduct in violation of Oregon's ARL, ORS 646A.295).

132.    Because Defendant illegally charged Plaintiff and the Class unlawful fees in connection with the LP Subscriptions, Plaintiff and Class members are entitled to recover statutory damages of $200 per UTPA violation.  *See* ORS 646.638(1) and (8)(a) (class members can recover "actual damages or statutory damages of $200, whichever is greater").

133.    In the alternative, Defendant's unlawful conduct as described above caused Plaintiff's and Oregon Class members' ascertainable losses because Defendant's acts and practices were intended to deceive Plaintiff and the Class, and – as a result of Plaintiff's and Oregon Class members' reasonable reliance on Defendant's omissions of material offer terms required to be disclosed by the Oregon ARL – those unlawful acts have caused, and will continue to cause, damages to Plaintiff and the Oregon Class in the form of ascertainable loss of money and property.

134.    As a direct and proximate result of Defendant's unlawful practices described herein, Defendant has received, and continue to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of fees collected from Plaintiff and Class members in connection with their LP Subscriptions.  Defendant has profited from its unlawful acts and practices in the amount of those business expenses and interest accrued thereon.  If Defendant had complied with the ARL, Defendant would not have made the unlawful charges, and would not have obtained these monies from Plaintiff and the Class.

135.    Defendant's violations of the UTPA under ORS 646.608(1)(ttt) as described above were willful, as well as reckless and/or knowing, because, at the time Defendant committed the violations at issue, Defendant knew or should have known that its actions violated

the Oregon UTPA.

136.    Accordingly, Plaintiff Easterbrook, individually and on behalf of similarly situated Oregon consumers, seeks all monetary and non-monetary relief permitted by law under ORS 646.605 *et seq*., including ORS 646.636 and ORS 646.638(1) and (8), including without limitation equitable relief, actual damages or statutory damages of $200 per violation (whichever is greater), and pre- and post judgment interest, along with any other appropriate equitable relief deemed necessary or proper.

137.    Further, Plaintiff and the Class seek recovery of punitive damages from Defendant because Defendant's conduct was reprehensible.  Defendant inflicted economic injury upon Plaintiff and the proposed Class in an intentional manner by, for instance, creating or causing to exist dark patterns on the LinkedIn Platform in order to: (1) trick users into unwittingly signing up for recurring bills in connection with the automatically renewing LP Subscriptions; and (2) prevent user unsubscription from the LP Subscriptions by adopting complex cancellation procedures to increase the friction in the subscription cancellation process. In other words, the user interface and experience of the LinkedIn Platform is fundamentally designed to enhance accidental sign-ups and prevent intentional cancellation, thereby ensuring continued revenues from consumers by trapping them in the ongoing subscription purchase.

138.    Indeed, Defendant utilized its singular control over the LinkedIn Platform and the LP Subscriptions to induce Plaintiff and the Class to purchase the LP Subscriptions over alternative automatic renewal programs for services offered by competitors that feature similar benefits and content and are sold at similar and/or lesser price points.

139.    Under ORS 646.638(3), Plaintiff and Class members are also entitled to recover their reasonable attorney fees from Defendant for Defendant's violations of Oregon law as detailed herein.

**<u>COUNT II</u>**
**Violations of Oregon's UTPA, ORS 646.608(1)(sss)**
**(*On Behalf Of The Oregon Subclass*)**

140.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

141.    Plaintiff brings this claim individually and on behalf of the members of the proposed Oregon Subclass against Defendant.

142.    At all relevant times, Defendant violated, and continues to violate, the UTPA's proscription against engaging in unlawful conduct by charging customers certain types of fees without first disclosing the required pre-purchase information and obtaining authorization in the particular way that the law requires.

143.    Specifically, Defendant's actions are "unlawful" within the meaning of the UTPA because it violated the Oregon's Free Offer Law ("FOL"), ORS 646.644, in direct violation of Section 646.608(1)(sss) of the UTPA.  In particular, following consumers' (including Plaintiff's and Oregon Subclass members') initial enrollments in the LP Subscriptions, Defendant automatically charges fees to consumers' Payment Methods, notwithstanding Defendant's uniform and systematic failure to provide legally required information at the point of purchase. As explained below, by doing so, Defendant violates multiple provisions of Oregon's FOL.

144.    Defendant's noncompliance with the FOL is a direct violation of UTPA.  *See* ORS 646.608(1)(sss) ("(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (sss) Violates

a provision of ORS 646.644 (Free offer).").

145.    Defendant violated, and continues to violate, the FOL under ORS 646.644(2) because, at all relevant times, it failed, and continue to fail, to "provide[] the consumer with clear and conspicuous information regarding the terms of the free offer before the consumer agrees to accept the free offer, including at a minimum:"  (i) "[i]dentification of all … enrollments in a membership, subscription or service contract, that the consumer will receive or incur a financial obligation for as a result of accepting the free offer[,]" in violation of ORS 646.644(2)(a); (ii) "[t]he cost to the consumer of any financial obligation the consumer will incur if the consumer accepts the free offer, including any fees or charges[,]" in violation of ORS 646.644(2)(b); (iii) "[a] statement[] … that by accepting the free offer, the consumer will become obligated for … enrollment in a membership, subscription or service contract, unless the consumer takes affirmative action to cancel the free offer or otherwise reject … the enrollment in a membership, subscription or service contract[,]" in violation of ORS 646.644(2)(d); (iv) "the consumer's right to cancel the free offer using procedures specifically identified for that purpose that, at a minimum, enable the consumer to cancel by calling a toll-free telephone number or to cancel in a manner substantially similar to that by which the consumer accepted the free offer[,]" in violation of ORS 646.644(2)(e); (v) "[t]he time period during which the consumer must cancel in order to avoid incurring a financial obligation as a result of accepting the free offer[,]" in violation of ORS 646.644(2)(f); and (vi) "the consumer's right to receive a credit on goods or services received as a result of accepting the free offer when the goods or services are returned or rejected, and the time period during which the goods or services must be returned or rejected for the purpose of receiving a credit[,]" in violation of ORS 646.644(2)(g).

146.    Further, Defendant violated, and continues to violate, the FOL under ORS

646.644(4) because it has, at all relevant times, imposed financial obligations on consumers,
including Plaintiff and the Oregon Subclass as a result of their acceptance of a free offer without
first obtaining their affirmative consent to the terms of the free offer as set forth in ORS
646.644(2).  *See* ORS 646.644(4) ("A person may not impose a financial obligation on a
consumer as a result of the consumer's acceptance of a free offer unless the consumer's
affirmative consent to the terms of the free offer as set forth in subsection (2) of this section is
obtained.").

147.    Thus, Defendant "failed to disclose the legally required information [or obtain the
requisite affirmative consent] and assessed a . . . fee in violation of the UTPA."  *Scharfstein v.
BP W. Coast Prod., LLC*, 292 Or. App. 69, 90 (2018).  "In doing so, [Defendant] illegally
charged [their] customers [recurring subscription fees], thereby causing the ascertainable loss."
*Id*.; *see also Rollins v. Wink Labs, Inc.*, 2021 WL 1976082, at *5 (D. Or. Feb. 22, 2021); *Stewart
v. Albertson's, Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Solano v.
Kroger Co.*, 2020 WL 7028473, at *3–4 (D. Or. Nov. 30, 2020); *Miller v. WinCo Foods, LLC*,
2020 WL 6693149, at *6–7 (D. Or. Sept. 3, 2020), *report and recommendation adopted*, 2020
WL 6685697 (D. Or. Nov. 12, 2020); *Russell v. Ray Klein, Inc.*, 2019 WL 6137455, at *4 (D. Or.
Nov. 19, 2019).

148.    Each and every charge posted to Plaintiff's and Subclass members' Payment
Methods in connection with the free trial LP Subscriptions during the relevant period amounts to
a distinct economic injury that gives rise to an independently actionable claim under the UTPA
based on Defendant's unlawful practice of charging consumers' Payment Methods without first
providing and obtaining the requisite disclosures and authorizations as required by the FOL.

149.    Defendant also violated the FOL under ORS 646.644(5) because, as alleged

above, *see supra*, it has "fail[ed] or refuse[d] to cancel the free offer [where] consumer[s have] used, or made reasonable efforts to attempt to use, one of the procedures required by [the FOL under ORS 646.644(2)(e).]"  ORS 646.644(5).  By way of example, on each of Ms. Easterbrook's two failed cancellation attempts, Ms. Easterbrook spent an excessive amount of time searching through the LinkedIn Website for a cancellation button or other similar online mechanism for cancellation, in attempt "to cancel in a manner substantially similar to that by which [Ms. Easterbrook] accepted the free offer" (also through the click of a button available on the LinkedIn Website), a cancellation procedure specifically required by ORS 646.644(2)(e). However, Ms. Easterbrook was unable to find any such mechanism for cancellation through the LinkedIn Website on those occasions, and, as a result, her attempts at cancellation were utterly ineffective.  That is, following Ms. Easterbrook's first two attempts at cancellation, Defendant continued to charge fees to her Payment Method for the subsequent months despite Plaintiff's "reasonable efforts to attempt to use[]one of the procedures required by [ORS 646.644(2)(e),]" in violation of the FOL under ORS 646.644(5).  Plaintiff's experience is just one example of Defendant's failure or refusal to cancel a free trial after a consumer has used, or made reasonable efforts to attempt to use, one of the required cancellation procedures, but Defendant's practice in this regard has become widespread and has thus caused injury to similarly situated consumers comprising the Oregon Subclass.

150.    Inasmuch, Plaintiff and Subclass members have sustained an ascertainable loss of money as a result of Defendant's use or employment of methods, acts, or practices declared unlawful by ORS 646.608(1)(sss) (*i.e.*, Defendant's conduct in violation of Oregon's FOL).

151.    Because Defendant illegally charged Plaintiff and the Subclass unlawful fees in connection with their enrollments in free trials to the LP Subscriptions, Plaintiff and Subclass

members are entitled to recover statutory damages of $200 per violation of the UTPA under ORS 646.608(1)(sss).  *See* ORS 646.638(1) and (8)(a) (class members can recover "actual damages or statutory damages of $200, whichever is greater").

152.    As alleged above, Defendant's violations of the UTPA under ORS 646.608(1)(sss) as described above were willful, as well as reckless and/or knowing, because, at the time Defendant committed the violations at issue, Defendant knew or should have known that its actions violated the Oregon UTPA.  *See supra.*

153.    Accordingly, Plaintiff, individually and on behalf of members of the proposed Oregon Subclass, seeks all monetary and non-monetary relief permitted by law under ORS 646.605 *et seq*., including ORS 646.636 and ORS 646.638(1) and (8), including equitable relief, actual damages or statutory damages of $200 per violation (whichever is greater), and pre- and post judgment interest, along with any other appropriate equitable relief deemed necessary or proper.

154.    Further, Plaintiff and the Subclass seek recovery of punitive damages from Defendant because Defendant's conduct was reprehensible in that Defendant utilized its singular control over the LinkedIn Platform to induce Plaintiff and the Class to purchase the LP Subscriptions over alternative automatic renewal programs for services offered by competitors that feature similar benefits and content and are sold at similar and/or lesser price points.

155.    Under ORS 646.638(3), Plaintiff and Oregon Subclass members are also entitled to recover their reasonable attorney fees from Defendant for Defendant's violations of Oregon law as detailed herein.

## COUNT III
### Unjust Enrichment / Restitution
### (*On Behalf Of The Nationwide Class*)

156.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

157.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant.

158.    Plaintiff and the Nationwide Class conferred benefits on Defendant by purchasing the LP Subscriptions.

159.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Nationwide Class's purchases of the LP Subscriptions.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of common law, induced Plaintiff and the Nationwide Class to purchase the LP Subscriptions.  These omissions caused injuries to Plaintiff and the Nationwide Class because they would not have purchased the LP Subscriptions at all, or on the same terms, if the true facts were known.

160.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Nationwide Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Nationwide Class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the proposed Oregon Class, Oregon Subclass, and Nationwide Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes and Subclass, and naming

Plaintiff's attorneys as Class Counsel to represent the Classes and Subclass;

(b)    For an order declaring the Defendant's conduct violates the statutes and common laws referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes and Subclass on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Classes and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: October 21, 2022                    Respectfully submitted,

**MARKOWITZ HERBOLD PC**

By:    *s/ Jermaine F. Brown*
       Stanton R. Gallegos, OSB #160091
       StantonGallegos@MarkowitzHerbold.com
       Jermaine F. Brown, OSB #073415
       JermaineBrown@MarkowitzHerbold.com
       *Attorneys for Plaintiff and the*
       *Putative Classes*

**BURSOR & FISHER, P.A.**

       Neal J. Deckant *
       ndeckant@bursor.com
       Julia K. Venditti *
       jventitti@bursor.com
       1990 North California Boulevard, Suite 940

Page 88 – FIRST AMENDED COMPLAINT

Walnut Creek, CA  94596
Telephone:  (925) 300-4455

Philip L. Fraietta *
pfraietta@bursor.com
Frederick J. Klorczyk III *
fklorczyk@bursor.com
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150

*Pro Hac Vice Application Forthcoming
Attorneys for Plaintiff and the Putative
Classes*